ACCEPTED
12-14-00357-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
3/11/2015 5:41:13 PM
CATHY LUSK
CLERK

*ORAL ARGUMENT REQUESTED*

## NO. 12-14-00357-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
3/11/2015 5:41:13 PM
CATHY S. LUSK
Clerk

## IN THE COURT OF APPEALS FOR THE TWELFTH DISTRICT AT TYLER, TEXAS

**PINECREST SNF, LLC D/B/A PINECREST
NURSING & REHABILITATION CENTER,**
*Appellant,*

v.

**TASCO BAILEY, NATHAN BAILEY, CURLIE BAILEY, ROY BAILEY,
BILL BAILEY, JAMES BAILEY, EARL BAILEY, MARY DUNLAP AND LICILLE
MARTIN, AS HEIRS OF ARCHIE BAILEY,**
*Appellees.*

**On Interlocutory Appeal from the
114th Judicial District Court of Smith County, Texas
Cause No. 14-0856-B
The Honorable Christi Kennedy Presiding**

## BRIEF OF PINECREST NURSING PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER

**NICHOL L. BUNN**
State Bar No. 00790394
**STEPHANIE F. ERHART**
State Bar No. 24007180
**LEWIS, BRISBOIS, BISGAARD
& SMITH, LLP**
2100 Ross Avenue, Suite 2000
Dallas, Texas 75201
(214) 722-7100
(214) 722-7111 (fax)
**ATTORNEYS FOR
PINECREST NURSING SNF, LLC
D/B/A PINECREST NURSING &
REHABILITATION CENTER**

4830-3029-8914.1

## IDENTITY OF PARTIES AND COUNSEL

In accordance with Rule 38.1(a) of the Texas Rules of Appellate Procedure, Pinecrest Nursing provides the following complete list of all parties and counsel to the trial court's order that forms the basis of this appeal:

**Pinecrest Nursing**:
*(Defendant)*

Pinecrest SNF, LLC d/b/a
Pinecrest Nursing & Rehabilitation Center

**Pinecrest Nursing's Counsel:**

Nichol L. Bunn (Trial & Appeal)
Stephanie F. Erhart (Appeal)
LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
2100 Ross Avenue, Suite 2000
Dallas, Texas 75201
(214) 722-7100
(214) 722-7111 (fax)
Nichol.Bunn@lewisbrisbois.com
Stephanie.Erhart@lewisbrisbois.com

**The Baileys:**
*(Plaintiffs)*

Tasco Bailey, Nathan Bailey, Curlie Bailey, Roy Bailey, Bill Bailey, James Bailey, Earl Bailey, Mary Dunlap, and Lucille Martin, as Heirs of Archie Bailey

**The Baileys' Counsel:**

Robert M. Wharton (Trial & Appeal)
Lauren Schultz (Trial & Appeal)
Mary E. Green (Trial & Appeal)
MCIVER BROWN LAW FIRM
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
(832) 767-1673
(832) 767-1783 (fax)
firm@mciverbrown.com

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .......................................................................... ii

TABLE OF CONTENTS ................................................................................................iii-iv

ABBREVIATIONS AND RECORD REFERENCES..............................................................v

INDEX OF AUTHORITIES........................................................................................ vi-ix

STATEMENT OF THE CASE ....................................................................................... x-xi

STATEMENT REGARDING ORAL ARGUMENT ...............................................................xi

STATEMENT OF JURISDICTION .............................................................................xi-xii

ISSUES PRESENTED.................................................................................................. xii

INTRODUCTION...........................................................................................................1

I.    STATEMENT OF FACTS ........................................................................................2

      A.    Factual Background ....................................................................... 2-3

      B.    Allegations Against Pinecrest Nursing ........................................3

      C.    Procedural History of Dr. Davey's Reports ...............................4

II.   SUMMARY OF THE ARGUMENT...........................................................................5

III.  ARGUMENT ........................................................................................................6

      A.    Standard of Review ..........................................................................6

      B.    Requirements of 74.351 Expert Reports ................................ 6-8

      C.    Dr. Davey's Amended Report is Deficient Because it Addresses
            Causation in a Conclusory Manner ........................................ 8-9

            1.    Dr. Davey's Amended Report Failed to Adequately Explain
                  How Pinecrest Nursing's Alleged Breaches of the Standard
                  of Care Caused Mrs. Bailey's Pressure Ulcer............................ 9-15

2.    Dr. Davey's Amended Report Failed to Adequately Explain How Pinecrest Nursing's Alleged Breaches of the Standard of Care Caused Mrs. Bailey's Death .......................................... 15-19

IV.   CONCLUSION AND PRAYER ........................................................20

CERTIFICATE OF SERVICE ...............................................................22

CERTIFICATE OF COMPLIANCE ..........................................................23

APPENDIX TO PINECREST NURSING'S BRIEF ..................................... 24-84

1. Amended Expert Report of Dr. Christopher Davey

2. Order on Expert Report Challenges

3. Amended Order on Expert Report Challenges

4. Tex. Civ. Prac. & Rem. Code 74.351

# ABBREVIATIONS AND RECORD REFERENCES

**ABBREVIATIONS:**

Pinecrest Nursing/Defendant Pinecrest SNF, LLC d/b/a Pinecrest Nursing & Rehabilitation Center is referred to as "Pinecrest Nursing" or "Pinecrest".

The Baileys/Plaintiffs Tasco Bailey, Nathan Bailey, Curlie Bailey, Roy Bailey, Bill Bailey, James Bailey, Earl Bailey, Mary Dunlap, and Lucille Martin, as Heirs of Archie Bailey are collectively referred to as "the Baileys".

Archie Bailey is referred to as "Mrs. Bailey".

Chapter 74 of the Texas Civil Practice & Remedies Code is referred to as "Chapter 74".

The Baileys' Chapter 74 Expert will be referred to as "Dr. Davey".

The report at issue – Dr. Davey's Amended Report filed on June 27, 2014 and attached to Plaintiffs' Notice of Filing Amended Ch. 74 Expert Report is referred to as the "Amended Report."

Curriculum vitae will be referred to as "CV".

**RECORD REFERENCES:**

References in the clerk's record are in the form (CR [page #]).

# TABLE OF AUTHORITIES

## STATE COURT CASES

*Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,*
46 S.W.3d 873 (Tex. 2001)..................................................................................... 6, 7, 10

*Austin Heart, P.A. v. Webb,*
228 S.W.3d 276 (Tex. App.—Austin 2007, no pet.) ............................................... 9

*Bakhtari v. Estate of Dumas,*
317 S.W.3d 486 (Tex. App.—Dallas 2010, no pet.)................................................ 8

*Bowie Mem'l Hosp. v. Wright,*
79 S.W.3d 48 (Tex. 2002).............................................................. 6, 7, 8, 12, 15

*Castillo v. August,*
248 S.W.3d 874 (Tex. App.—El Paso 2008, no pet.)............................................. 8

*Christus Spohn Health Sys. Corp. v. Castro,*
No. 13-13-00302-CV, 2013 Tex. App. LEXIS 14932 (Tex. App.—Corpus Christi
Dec. 12, 2013, no pet.)........................................................................................... 13

*Conboy v. Lindale Health Care, LLC, NO.,*
12-12-00241-CV, 2013 Tex. App. LEXIS 11013 (Tex. App.—Tyler Aug. 29, 2013,
no pet.) ................................................................................................................... 14

*Constancio v. Bray,*
266 S.W.3d 149 (Tex. App.—Austin 2008, no pet.) .............................................. 18

*Cooper v. Arizpe,*
No. 04-07-00734-CV, 2008 Tex. App. LEXIS 2506, 2008 WL 940490 (Tex. App.—
San Antonio Apr. 9, 2008, pet. denied) .................................................................. 11

*Costello v. Christus Santa Rosa Health Care Corp.,*
141 S.W.3d 245 (Tex. App.—San Antonio 2004, no pet.)......................... 8, 16, 19

*Doe v. Boys Clubs,*
907 S.W.2d 472, 477 (Tex. 1995)........................................................................... 19

*Granbury Hosp. Corp. v. Hosack,*
No. 10-09-00297-CV, 2010 Tex. App. LEXIS 3132 (Tex. App.—Waco Apr. 28,
2010, no pet.) ......................................................................................................... 17

*Hillcrest Baptist Med. Ctr. v. Payne,*
No. 10-11-00191-CV, 2011 Tex. App. LEXIS 9182 (Tex. App.—Waco Nov. 16,
2011, pet. denied) ...................................................................................................... 14

*Hutchinson v. Montemayor,*
144 S.W.3d 614 (Tex. App.—San Antonio 2004, no pet.) ....................................... 11

*IHS Cedars Treatment Ctr. v. Mason,*
143 S.W.3d 794 (Tex. 2003) ................................................................................... 8, 16

*Jelinek v. Casas,*
328 S.W.3d 526 (Tex. 2010) .................................................................................. 11, 15

*Jernigan v. Langley,*
195 S.W.3d 91 (Tex. 2006) .......................................................................................... 6

*Lear Siegler, Inc. v. Perez,*
819 S.W.2d 470 (Tex. 1991) ................................................................................... 16, 19

*Lewis v. Funderburk,*
234 S.W.3d 204 (Tex. 2008) ......................................................................................... 3

*Loaisiga v. Cerda,*
379 S.W.3d 248 (Tex. 2012) ......................................................................................... 6

*Methodist Hosp. of Dallas v. King,*
365 S.W.3d 847 (Tex. App.—Dallas 2012, no pet.) ..................................................... 6

*Murphy v. Mendoza,*
234 S.W.3d 23 (Tex. App.—El Paso 2007, no pet.) .................................................... 11

*Nacogdoches County Hosp. Dist. v. Felmet, NO.,*
12-12-00393-CV, 2013 Tex. App. LEXIS 14478 (Tex. App. —Tyler Nov. 26, 2013,
no pet.) ........................................................................................................................ 10

*Nexion Health at Southwood, Inc. v. Judalet,*
No. 12-08-00464-CV, 2009 Tex. App. LEXIS 7404 (Tex. App. —Tyler Sept. 23,
2009, no pet.) ............................................................................................................... 18

*Nexion Health at Southwood, Inc. v. Judalet,*
No. 12-08-00464-CV, 2009 Tex. App. LEXIS 7404 (Tex. App.—Tyler Sept. 23,
2009, no pet.) .......................................................................................................... 13, 17

*Ortiz v. Patterson,*
No. 05–10–01356–CV, 2012 WL 3809217 (Tex. App.—Dallas, Aug. 31, 2012, no
pet. h.) ........................................................................................................................... 7

*Perez v. Daughters of Charity Health Servs. of Austin,*
  No. 03-08-00200-CV, 2008 Tex. App. LEXIS 7648, 2008 WL 4531558 (Tex. App.—
  Austin Oct. 10, 2008, no pet.) ............................................................................................. 18

*Pisasale v. The Ensign Group, Inc.,*
  No. 11-05-00196-CV, 2006 Tex. App. LEXIS 7983 (Tex. App. —Eastland
  September 7, 2006, pet. denied) .......................................................................................... 14

*Regent Care Ctr. of San Antonio II, Ltd. P'ship v. Hargrave,*
  300 S.W.3d 343 (Tex. App.—San Antonio 2009, pet. denied) .............................................. 19

*Regent Health Care Ctr. of El Paso, L.P. v. Wallace,*
  271 S.W.3d 434 (Tex. App. —El Paso 2008, no pet.) ............................................................ 17

*Simonson v. Keppard,*
  225 S.W.3d 868 (Tex. App.—Dallas 2007, no pet.) ................................................................. 6

*Valle v. Taylor, NO.,*
  09-11-00223-CV, 2012 Tex. App. LEXIS 110 (Tex. App.—Beaumont Jan. 5, 2012,
  no pet.) ................................................................................................................................ 17

## STATUTORY AUTHORITIES

Tex. Civ. Prac. & Rem. Code § 51.014(a)(9)(West.......................................................................... 3

Tex. Civ. Prac. & Rem. Code §74.351. ......................................................................................... 4

Tex. Civ. Prac. & Rem. Code §74.351 ....................................................................................... 25

Tex. Gov't Code § 22.201(m).................................................................................................... 3

Tex. Gov't Code § 24.216........................................................................................................... 3

## STATE RULES AND REGULATIONS

Tex. R. App. P. 25.1.................................................................................................................. 22

Tex. R. Civ. P. 21a................................................................................................................... 22

Tex. R. APP. P. 9.4................................................................................................................... 23

This health care liability claim arises from the care given to a resident during one month of a three-year stay in a nursing home. This interlocutory appeal focuses on the trial court's ruling regarding the sufficiency of the 74.351 expert report of Dr. Christopher Davey. (CR 243).

The Baileys filed the underlying health care liability lawsuit claiming that Pinecrest Nursing was negligent in providing nursing care to Archie Bailey during her residency in its facility thereby resulting in the development of a pressure sore which became infected and contributed to Mrs. Bailey's death. (CR 1-12). In an attempt to comply with the statutory requirements of Chapter 74 of the Texas Civil Practice and Remedies Code, the Baileys served an expert report and curriculum vitae ("CV") of Christopher M. Davey, M.D. ("Dr. Davey"). (CR 54-74). Pinecrest Nursing objected to Dr. Davey's report. (CR 75-105). The Court ruled that Dr. Davey's report was insufficient and gave the Baileys an extension in which to cure the deficiencies in Dr. Davey's report. (CR 139-140).

The Baileys filed an Amended Report from Dr. Davey. (CR 141-165). Because Dr. Davey's opinions regarding causation were conclusory, Pinecrest Nursing objected that the Amended Report was still inadequate. (CR 166-192). The Baileys filed an Original and an Amended Motion to Overrule Defendant's Objections to the Amended Chapter 74 Report of Christopher M. Davey, M.D.

(CR 193-237). Pinecrest Nursing responded to the Baileys motion and requested its objections be sustained. (CR 238-242). The Court overruled Pinecrest Nursing's objections by Order entered on November 25, 2014. (CR 243). This appeal ensued. (CR 244-245).

## STATEMENT REGARDING ORAL ARGUMENT

Pinecrest Nursing believes that oral argument would aid the Court in reaching a resolution of this case. Even if the facts are simple (and medical facts rarely are) and the legal issue is straightforward, oral argument will allow the parties to explain the application of law to fact and, in particular, how the report of Dr. Davey fails to satisfy the Chapter 74 requirements. Additionally, it would also allow the parties to answer any questions that the Court may have.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to hear an interlocutory appeal denying a motion to dismiss in a health care liability claim. *Lewis v. Funderburk*, 234 S.W.3d 204, 208 (Tex. 2008); TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9)(West Supp. 2012). "The 114th Judicial District is composed of Smith County." TEX. GOV'T CODE § 24.216 (West 2013). This Court's appellate district contains Smith County, among other counties. TEX. GOV'T CODE § 22.201(m) (West Supp. 2014). Thus, this Court has jurisdiction to determine this interlocutory appeal about the trial court's abuse

of discretion in ruling on Pinecrest Nursing's objections to the 74.351 expert report and its motion to dismiss.

## ISSUE PRESENTED

Section 74.351 requires that the expert report explain the causal connection between the alleged breaches in the standard of care and the injuries in question in a non-conclusory manner. The report in this case only addresses causation in a conclusory manner. It does not adequately explain how any breaches in the standard of care by Pinecrest proximately caused injury to Mrs. Bailey. Further, the Baileys' expert report fails to explain how Pinecrest Nursing's conduct caused Mrs. Bailey's death by cardiac arrest three months after she left the facility. Did the trial court abuse its discretion in applying the law of 74.351 reports to Dr. Davey's report?

**TO THE HONORABLE TWELFTH DISTRICT COURT OF APPEALS:**

Appellant Pinecrest Nursing submits this Brief praying that this Court reverses the trial court's ruling overruling the Chapter 74 objections and denying Appellant's motion to dismiss.

## INTRODUCTION

Dr. Davey's report fails to comply with the statutory requirements of Chapter 74 because it contains no analysis of causation. In fact, the fifteen page report only mentions causation in one 5 sentence paragraph and fails to adequately explain the link between the alleged breaches in the standard of care to the cause of Mrs. Bailey's pressure ulcers and/or death. Although the report concedes that an individual's clinical condition can make pressure ulcers **unavoidable**, there is no discussion of Mrs. Bailey's underlying conditions and whether or not her pressure ulcers were unavoidable in her case. As such, the report does not sufficiently address causation with respect to Mrs. Bailey's pressure ulcer and simply concludes that her death was a result of Pinecrest Nursing's conduct without adequately linking the two.

The report's lack of analysis is insufficient to meet even these minimal standards. Therefore, the trial court abused its discretion when it found the report sufficient.

1

# I.
## STATEMENT OF FACTS

## A.    Factual Background

This is a healthcare liability claim arising from the last month of residency of 88 year-old Archie Bailey at Pinecrest Nursing & Rehabilitation Center. Although Mrs. Bailey was a resident of Pinecrest for over 3 years, the care questioned by the Baileys is limited to one month of her time there. (CR 4-9; 141-165). Mrs. Bailey was admitted to Pinecrest on June 12, 2010 for long term care for Alzheimer's disease. (CR 146). At the time of her admission, Mrs. Bailey was 84 years old and her medical diagnoses included, but were not limited to: Alzheimer's disease; Hypertension; Congestive Heart Failure; Diabetes Mellinus (Type II); and Asthma. *See id*.

Almost three years after her admission, on March 20, 2013, Mrs. Bailey developed a pressure ulcer. (CR 146). However, it resolved with in two weeks. *See id*. Mrs. Bailey had no other skin issues until August 12, 2013. (CR 146). At that time, the nursing staff observed a 0.3x0.2cm sized macerated area on Mrs. Bailey's gluteal fold. (CR 146). By August 19, 2013, the area was slightly bigger at 0.3x0.3cm and a small amount of serous exudate was observed with an odor. *Id.* Between August 19, 2013 and September 19, 2013, Mrs. Bailey's pressure ulcer treatments were provided by her doctors, including a wound specialist, and nurses

at Pinecrest, but as of September 19, 2013, the wound had deteriorated to a Stage IV pressure ulcer. (CR 146-147).

On September 19, 2013, Mrs. Bailey was discharged from Pinecrest Nursing to Trinity Mother Francis Hospital where she was diagnosed with an UTI and infected wound. (CR 146-147). She did not return to Pinecrest Nursing. *Id.* Between September 19, 2013 and December 2013, Mrs. Bailey was in and out of the hospital and rehabilitation facilities with a host of problems related to her underlying conditions. (CR 146-147). Mrs. Bailey died on December 4, 2013 at the age of 88 years old. (CR 147). According to her death certificate, Mrs. Bailey's cause of death was cardio pulmonary arrest. *Id.* No autopsy was performed.

## B. Allegations Against Pinecrest Nursing

On March 31, 2014, Mrs. Bailey's husband and nine adult children ("the Baileys") filed a survival action based on a theory of medical negligence. (CR 1-12). Specifically, the Baileys claim that Pinecrest Nursing's nursing staff failed to accurately asses Mrs. Bailey's condition; failed to implement proper measures to prevent ulcers, and; failed to appropriately and timely treat the ulcers. *Id.* They further claim Pinecrest Nursing's facility was understaffed and that these failures led to the development and deterioration of Mrs. Bailey's wound and subsequent infection, which caused her death. *Id.*

## C. Procedural History of Challenges to Dr. Davey's Reports

As a health care liability claim, the Baileys' claim is governed by Chapter 74 of the Texas Civil Practice & Remedies Code ("Chapter 74"). In an effort to comply with the reporting requirements of Chapter 74, the Baileys served an expert report and curriculum vitae prepared by Dr. Christopher Davey. (CR 54-74); TEX. CIV. PRAC. & REM. CODE §74.351. Pinecrest Nursing filed an objection to Dr. Davey's report. (CR 75-105). Following hearing, the trial court ruled that Dr. Davey's report was insufficient and gave the Baileys an extension in which to cure the deficiencies in Dr. Davey's report. (CR 139-140).

In an attempt to cure the deficiencies, the Baileys filed an Amended Report from Dr. Davey. (CR 141-165). However, the Amended Report failed to adequately explain how any of the alleged breaches cause injuries or Mrs. Bailey's pressure ulcer and death and was only conclusory in this regard; therefore, Pinecrest Nursing again filed objections. (CR 166-192). The Baileys filed a Motion to Overrule Defendant's Objections to the Amended Chapter 74 Report of Christopher M. Davey, M.D. and an Amended Motion seeking to overrule Pinecrest Nursing's objections to the Amended Report. (CR 193-237). The Court overruled Pinecrest Nursing's objections by Order entered on November 25, 2014. (CR 243). Pinecrest timely filed its notice of accelerated appeal from the Trial Court's interlocutory Order. (CR 244-245).

4

## II.
### SUMMARY OF THE ARGUMENT

The trial court abused its discretion in evaluating Dr. Davey's expert report when it failed to rule that the report was inadequate, as Dr. Davey's report lacks the required analysis on the causation requirement. First, although Dr. Davey summarily states that alleged breach of the standard of care by Pinecrest Nursing caused Mrs. Bailey's pressure ulcer, his report fails to explain how. Importantly, Dr. Davey concedes that a patient's underlying conditions can make pressure ulcers unavoidable; however, nowhere in his report does he discuss whether Mrs. Bailey's underlying conditions (Alzheimer's, congestive heart failure, diabetes mellitus) made her pressure ulcer unavoidable. The report fails to explain that absent the act or omission of Pinecrest Nursing the harm would not have occurred. Finally, Dr. Davey states that Pinecrest Nursing's conduct was a *contributing* factor to Mrs. Bailey's death. However, nowhere in his report does Dr. Davey explain how Pinecrest Nursing's breach of the only identified standard of care (alleged failure to reposition Mrs. Bailey in August and September 2013) was a *substantial* factor in bringing about her death in December 2013 at a different facility. Despite the omission of a causation analysis, the trial court found Dr. Davey's report sufficient on causation. Because the trial court abused its discretion in applying Chapter 74 causation requirements to the report of Dr. Davey, this Court should reverse and remand.

## III.
### ARGUMENTS

**A. Standard of Review**

A trial court's order on a Chapter 74 motion to dismiss is reviewed for an abuse of discretion. *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006) (per curiam)[1]; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Simonson v. Keppard*, 225 S.W.3d 868, 871 (Tex. App.—Dallas 2007, no pet.). The trial court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to any guiding rules and principles. *Simonson*, 225 S.W.3d at 871. When reviewing factual matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). A trial court cannot exercise discretion when determining what the law is or when applying the law to the facts. *Methodist Hosp. of Dallas v. King,* 365 S.W.3d 847, 849 (Tex. App.—Dallas 2012, no pet.).

**B. Requirements of 74.351 Expert Reports**

A court shall grant a motion challenging the adequacy of an expert report when the report "does not represent an objective good faith effort to comply" with the statutory definition of an expert report. § 74.351(l); *Loaisiga v. Cerda*, 379 S.W.3d

---

[1] Discussing former Article 4590i of the Texas Revised Civil Statute Annotated, which was the precursor to Chapter 74. *See Jernigan*, 195 S.W.3d at 92 n.1.

248 (Tex. 2012); *Ortiz v. Patterson*, No. 05–10–01356–CV, 2012 WL 3809217, \*3

(Tex. App.—Dallas, Aug. 31, 2012, no pet. h.). According to the Texas Civil Practice

& Remedies Code, an "expert report" is defined as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). An expert report that omits any of these statutory requirements

does not represent a good faith effort. *Palacios,* 46 S.W.3d at 879. While the expert

report does not have to marshal the plaintiff's proof, it must provide a fair

summary of the above elements. *See Wright,* 79 S.W.3d at 52. Ultimately, the

report must inform the defendant with sufficient specificity the conduct called into

question and provide a basis for the trial court to conclude the claims have merit.

*Id.*

A report cannot merely state the expert's conclusions about the standard of

care, breach, and causation. *Palacios,* 46 S.W.3d at 879. An expert must explain

the basis of his statements to link his conclusions to the facts. *Wright,* 79 S.W.3d at

52. When determining the sufficiency of the report, the courts look exclusively

within the four corners of the report itself. *Id.* Inferences from the report are not

permitted. *Id. at* 53. Thus, all of the information and explanations necessary to

7

satisfy the expert report requirements must be contained within the report itself. *See id.*

### C. Dr. Davey's Amended Report is Deficient Because it Addresses Causation in a Conclusory Manner.

A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent this act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp*., 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). Cause in fact is not established where a defendant's negligence "does no more than furnish a condition which makes the injuries possible." *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2003).

To satisfy the required element of causation under chapter 74, an expert report must include a fair summary of the expert's opinion regarding the causal relationship between the breach of the standard of care and the injury, harm, or damages claimed. *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.). Merely providing some insight into the plaintiff's claims does not adequately address causation. *Wright*, 79 S.W.3d at 53. Accordingly, causation cannot be inferred; it must be clearly stated. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.—El Paso 2008, no pet.). Indeed, a court may not fill in gaps in a report by drawing inferences or guessing what the expert meant or

intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.).

> 1. **Dr. Davey's Amended Report Failed to Adequately Explain How Pinecrest Nursing's Alleged Breaches of the Standard of Care Caused Mrs. Bailey's Pressure Ulcer.**

Dr. Davey's report reads like a manual on possible interventions to address pressure ulcers. (CR 144-158). A large portion of his report appears to be taken from another source that generally discusses and explains pressure ulcers, their causes, and treatments. (CR 148-151, 155-157). While the report generally discusses topics, it is difficult to identify the standards of care applicable to Pinecrest Nursing.

This is most evident when considering his causation paragraph. Despite the fact that Dr. Davey's report is 15 pages long, he only mentions causation in one 5 sentence paragraph at the very end of his report. However, his statement fails to specifically identify the standard of care applicable to Pinecrest Nursing that caused harm to Mrs. Bailey. Dr. Davey states:

> Because Pinecrest Nursing failed to reposition her every two hours and failed to implement effective interventions, Ms. Bailey had sustained pressure on her sacral area, which caused the blood to stop flowing to that part of the body and the skin to distort. Because of the lack of blood flow, the tissue died, causing Ms. Bailey to develop an infected State IV pressure ulcer.

(CR 158). However, Dr. Davey's causation paragraph fails to identify the specific "effective interventions" that the standard of care dictated should have been

9

implemented.  This statement by Dr. Davey is conclusory and does not sufficiently explain how these unidentified "interventions" caused harm to Mrs. Bailey. Identifying the standard of care in a health care liability claim is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios*, 46 S.W.3d at 880; *Nacogdoches County Hosp. Dist. v. Felmet*, NO. 12-12-00393-CV, 2013 Tex. App. LEXIS 14478, 14 (Tex. App. –Tyler Nov. 26, 2013, no pet.) (concluding expert report deficient where it failed to explain how the deviation from the standards led to the patient's subsequent surgeries)

Additionally, Dr. Davey's opinion that the nurses' failure to reposition Mrs. Bailey is speculative and conclusory in that it is not supported by the facts because Dr. Davey relied on an assumption.  He states "the medical records fail to present any evidence that Ms. Bailey's turning/repositioning schedule was ever documented, which suggests she was not repositioned every two hours. . . . Over the course of Ms. Bailey's entire stay at Pinecrest Nursing, there are no entries in the nursing notes indicating the resident was every repositioned."  (CR 152). Despite the fact that Dr. Davey states that he reviewed the medical records of Pinecrest Nursing & Rehab Center for over three years of care, he did not find any notes regarding the repositioning of Ms. Bailey.  Therefore, he assumes that in three years, the patient was **never** repositioned.  (CR 152).  Dr. Davey's

10

assumption is absurd and not based on fact. If repositioning was as important as he would lead this Court to believe, if Mrs. Bailey was truly never repositioned, surely she would have developed a pressure ulcer much sooner in her 3 year residency. This point makes it clear that Dr. Davey's opinion is based upon conjecture.

Interestingly, although Dr. Davey indicated that he reviewed all of Mrs. Bailey's records from Pinecrest Nursing's, he fails to point to any doctors' orders that the nurses did not follow, fails to point to any evidence that the nurses did not follow a plan of care or interventions ordered by the doctors, and Dr. Davey does not identify any information that the nurses did not provide to doctors. (CR 141-165). "[L]iability in a medical malpractice suit cannot be made to turn upon speculation or conjecture." *Hutchinson v. Montemayor*, 144 S.W.3d 614, 618 (Tex. App.—San Antonio 2004, no pet.). An opinion is speculative if an expert's opinion is not supported by the established facts but only by an assumption regarding the underlying facts. *See Cooper v. Arizpe*, No. 04-07-00734-CV, 2008 Tex. App. LEXIS 2506, 2008 WL 940490, at *3 (Tex. App.—San Antonio Apr. 9, 2008, pet. denied) (mem. op.) (citing *Murphy v. Mendoza*, 234 S.W.3d 23, 28 (Tex. App.—El Paso 2007, no pet.)). An expert must explain the basis of his statements and link his conclusions to the facts in order for his opinions not to be conclusory. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). Dr. Davey's opinion based on

11

assumptions that are not tied to facts in the record are speculative and are not sufficient to meet Chapter 74's requirements. *See id.* Ultimately, the report fails to inform Pinecrest Nursing with sufficient specificity the conduct called into question and provide a basis for the trial court to conclude the claims have merit. *See Wright,* 79 S.W.3d at 52.

Further evidence of the conclusory nature of Dr. Davey's opinion regarding causation is the following statement in his report:

> the standard of care mandates that a facility and its nurses ensure that a resident who is admitted without pressure sores does not develop pressure sores **unless the individual's clinical condition demonstrates that they were unavoidable**. . .

(CR 151) (emphasis added). Despite the fact that Dr. Davey concedes that Mrs. Bailey's clinical condition alone could be the cause of her pressure ulcer, nowhere in his report does he address her clinical condition and whether it was the sole cause of her pressure ulcer. The underlying conditions in this 84 year old woman were not insignificant. According to Dr. Davey's own report, Mrs. Bailey had Alzheimer's disease; Hypertension; Congestive Heart Failure; Diabetes Mellinus (Type II); and Asthma. (CR 146). However, Dr. Davey's report does not address any of these conditions and their propensity to make pressure ulcers unavoidable. Further, although Dr. Davey seems to focus on the time in which the ulcer deteriorated, he does not discuss the development of pressure ulcers, and he failed to address the fact that they can develop and deteriorate very quickly in patients

12

despite adequate care.  Additionally, Dr. Davey does not address why Mrs. Bailey continued to develop pressure ulcers even after she left Pinecrest Nursing and was a patient of a different facility.  Because Dr. Davey's report fails to discuss Mrs. Bailey's development of a pressure ulcer in the context of her underlying conditions, his conclusion on the cause of her injuries is impermissibly incomplete.

In a strikingly similar case, the Corpus Christi Court of Appeals held that an expert report was conclusory where it failed to address the patient's underlying health issues and their effects on the development of pressure ulcers.  *Christus Spohn Health Sys. Corp. v. Castro*, No. 13-13-00302-CV, 2013 Tex. App. LEXIS 14932 (Tex. App.—Corpus Christi Dec. 12, 2013, no pet.).  The Court explained:

> Although du Bois and Dr. Starer's reports go into great detail about the procedures necessary to prevent pressure ulcers in standard conditions, they do not address the specific conditions present in Castro's care. As discussed in detail above, Castro's claim involves his development of a pressure ulcer while he was being treated in Spohn's ICU over the course of several months for severe injuries he suffered in an automobile accident. Neither du Bois nor Dr. Starer discusses Castro's injuries in the context of these conditions. And the omission of this context renders any conclusion on the cause of Castro's injuries incomplete.  Because Castro's reports do not adequately address the causation element, they did not provide a basis for the trial court to conclude that Castro's claims have merit.

*Id.* at *18-19.  The Court reversed the order of the trial court denying Spohn's motion to dismiss.  *Id.; see also Nexion Health at Southwood, Inc. v. Judalet,* No. 12-08-00464-CV, 2009 Tex. App. LEXIS 7404, 11 (Tex. App.—Tyler Sept. 23,

2009, no pet.) ("Dr. Colon's opinion on causation is conclusory because he failed to explain how he ruled out other probable causes of the decedent's death.").

Other courts of appeals have recognized the requirement of discussing a patient's underlying conditions to adequately address causation. *See Pisasale v. The Ensign Group, Inc.,* No. 11-05-00196-CV, 2006 Tex. App. LEXIS 7983 (Tex. App.--Eastland September 7, 2006, pet. denied) (memo. op.) (holding expert report did not constitute a good-faith effort to comply with statute where, among other things, expert "made no effort to eliminate [the deceased's] preexisting conditions as the cause for the injuries described in his report"); *compare Hillcrest Baptist Med. Ctr. v. Payne,* No. 10-11-00191-CV, 2011 Tex. App. LEXIS 9182 (Tex. App.—Waco Nov. 16, 2011, pet. denied)(concluding report sufficient where "Dr. Haines opined that, based on a reasonable degree of medical probability, the other conditions did not contribute to the development of Payne's pressure ulcers."); *see also Conboy v. Lindale Health Care*, LLC, NO. 12-12-00241-CV, 2013 Tex. App. LEXIS 11013, 11 (Tex. App.—Tyler Aug. 29, 2013, no pet.) ("While Dr. Langan may not have been required to rule out all possible causes, he must establish in his report a causal connection between the defendants' conduct and the injuries Jack suffered, and that the defendants proximately caused the injuries suffered.").

While Dr. Davey's report identifies multiple alleged breaches of the standard of care, he only mentions one of those standards in his causation paragraph.

However, he does not explain how and why the allegedly breach caused the injury. The report fails to contain sufficiently specific information to demonstrate causation beyond mere conjecture. Ultimately, because Dr. Davey's report does not address Mrs. Bailey's underlying conditions, it fails explain why a different, better result would have been achieved if Pinecrest Nursing had met its standard of care. *See Hollingsworth*, 353 S.W.3d at 523. There is no question that Dr. Davey's report fails to inform Pinecrest Nursing with sufficient specificity the conduct called into question and provide a basis for the trial court to conclude the claims have merit. *See Wright,* 79 S.W.3d at 52. Therefore, the trial court abused its discretion in overruling Pinecrest Nursing's objection to Dr. Davey's report. *Jelinek,* 328 S.W.3d at 539-40.

> **2.    Dr. Davey's Amended Report Fails to Adequately Explain How Pinecrest Nursing's Alleged Breaches of the Standard of Care Caused Mrs. Bailey's Death.**

Although Dr. Davey's report summarized select records related to Mrs. Bailey's nursing home visit between August and September 2013 and he summarily stated her ulcer was a contributing factor to her death, Dr. Davey's report fails to articulate facts connecting the criticized deviations from the standard of care by Pinecrest Nursing to Mrs. Bailey's death.

In his report, Dr. Davey states:

On 12-4-13, Ms. Bailey expired from cardio pulmonary arrest, as indicated on her death certificate (TR-002743). However, it is my

15

opinion, to a reasonable degree of medical probability, that Ms. Bailey's large and infected ulcer was a significant, contributing factor to her death.

(CR 148). Despite this proclamation, Dr. Davey's report is not sufficient as to causation under the applicable standard. The standard is substantial factor, not contributing factor. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991) (holding that it is not enough that harm would not have occurred had actor not been negligent and that actor's negligence must also be a substantial factor in bringing about the plaintiff's harm).

Moreover, nowhere in his report does Dr. Davey explain how Pinecrest Nursing's breach of the only identified standard of care (alleged failure to reposition Mrs. Bailey in August and September 2013) was a substantial factor in bringing about her death in December 2013 at a different facility. Chapter 74 dictates that his report must demonstrate that Pinecrest Nursing's actions did *more* than simply furnish a condition that made the injuries possible. *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798. To summarily state that the failure to reposition Mrs. Bailey every two hours from August until September was a substantial factor in bringing about Mrs. Bailey's death in December without discussing her clinical course over those intervening months at different facilities and her underlying health issues, namely Alzheimer's, diabetes mellinus, and

congestive heart failure, undermines the very requirement of proximate causation. *Costello*, 141 S.W.3d at 249.

In a similar case involving pressure ulcers, the Beaumont Court of Appeals found an expert report deficient where the expert failed to explain how pressure ulcers were related to the patient's death. The Court explained

> Dr. Rushing addresses the element of causation in his report. However, unlike the report in *Nexion*, Dr. Rushing's report does not address whether the condition at issue here (pressure ulcers) can lead to death, under what circumstances such condition can lead to death, or how the ankle fracture or pressure ulcers caused or contributed to Taylor's death in this case.

*Valle v. Taylor*, NO. 09-11-00223-CV, 2012 Tex. App. LEXIS 110 (Tex. App.— Beaumont Jan. 5, 2012, no pet.). This case is similar to *Valle* in that Dr. Davey's report does not address whether pressure ulcers can lead to death, under what circumstances such condition can lead to death, or how the pressure ulcer caused or contributed to Mrs. Bailey's death. Therefore, Dr. Davey's report in this case, as the report in *Valle*, is deficient.

Courts of appeals are consistent in requiring more than Dr. Davey has stated in his report in cases involving allegations that pressure ulcers have caused a death. *See also Granbury Hosp. Corp. v. Hosack*, No. 10-09-00297-CV, 2010 Tex. App. LEXIS 3132, 6-7 (Tex. App.—Waco Apr. 28, 2010, no pet.) (concluding expert report insufficient on element of causation where report failed to connect the occurrence of pressure ulcers to patient's cardiorespiratory arrest and death);

17

*Regent Health Care Ctr. of El Paso, L.P. v. Wallace*, 271 S.W.3d 434, 441 (Tex. App.--El Paso 2008, no pet.) ("[W]hile the report indicates that the breach of the standard of care resulted in worsening of the described skin conditions, there is no linkage to the cause of death, aside from the assertion of a close temporal proximity between the conditions and the premature death.").

Courts, including this Court, have consistently required more than what Dr. Davey has provided in terms of expert testimony on causation in the context of section 74.351. *See Nexion Health at Southwood, Inc. v. Judalet*, No. 12-08-00464-CV, 2009 Tex. App. LEXIS 7404, *11 (Tex. App.--Tyler Sept. 23, 2009, no pet.) (mem. op.) (Expert report was deficient on causation because "[expert] failed to explain the causal relationship between the decedent's leg fracture and her death;" i.e., "how a fractured leg caused her to experience congestive heart failure."); *Constancio v. Bray*, 266 S.W.3d 149, 157-58 (Tex. App.—Austin 2008, no pet.) (holding that expert report that alleged that breach of standard of care by doctor caused patient's death is insufficient when report did not explain how increased monitoring of patient, detection of hypoxemia, and other actions would have prevented patient's death); *Perez v. Daughters of Charity Health Servs. of Austin*, No. 03-08-00200-CV, 2008 Tex. App. LEXIS 7648, 2008 WL 4531558, at *4 (Tex. App.—Austin Oct. 10, 2008, no pet.) (mem. op.) (concluding expert report

insufficient on causation because it did not link hospital's actions to patient's death that would have been prevented had hospital complied with standard of care).

In fact, the San Antonio Court of Appeals held that Dr. Davey's report was deficient in a similar case. *Regent Care Ctr. of San Antonio II, Ltd. P'ship v. Hargrave*, 300 S.W.3d 343, 348 (Tex. App.—San Antonio 2009, pet. denied). The Court stated "Dr. Davey's opinion fails to articulate facts connecting the criticized deviations from the standard of care by Regent Care with Mrs. Montgomery's dehydration, sepsis, or death." Therefore, the Court held that Dr. Davey's report failed to represent a good-faith effort to comply with the statutory requirements and held that the trial court abused its discretion in failing to dismiss the case against Regent Care Center. *Id.*

In this case, Dr. Davey's opinions were wholly inadequate in establishing a causal connection between Pinecrest Nursing's actions and Mrs. Bailey's death. The conduct of Pinecrest Nursing is too attenuated from the resulting injuries to Mrs. Bailey to be a substantial factor in bringing about the harm. *Doe v. Boys Clubs,* 907 S.W.2d 472, 477, (Tex. 1995). In fact, Dr. Davey's report does not even state that Pinecrest Nursing's conduct was a substantial factor, only a contributing factor. However, the Texas Supreme Court has held that is not sufficient. *Perez*, 819 S.W.2d at 472. Because Dr. Davey's report fails to explain how Pinecrest Nursing's conduct was a substantial factor in Mrs. Bailey's death,

19

his report is deficient and the Court should have sustained Pinecrest Nursing's objections to the report. *Costello*, 141 S.W.3d at 249.

## IV.
### CONCLUSION AND PRAYER

Dr. Davey's Amended Report failed to comply with the statutory requirements of Chapter 74. Specifically, Dr. Davey's Amended Report fails to explain how or why any alleged breaches in the standard of care by Pinecrest Nursing were a substantial factor in bringing about Mrs. Bailey's pressure ulcer. Dr. Davey's Amended Report fails to address whether Mrs. Bailey's pressure ulcer was unavoidable in this case. As such, this Court is left to infer or guess that Mrs. Bailey's outcome would have been different absent Pinecrest Nursing's alleged breaches of the standard of care. Furthermore, Dr. Davey wholly failed explain how or why any alleged breaches in the standard of care by Pinecrest Nursing were a substantial factor in bringing about Mrs. Bailey's death. Thus, the trial court abused its discretion in denying Pinecrest Nursing's objections to Dr. Davey's Amended Report and Motion to Dismiss with Prejudice, and this Court should reverse the trial court's decision and dismiss the Baileys' claims against Pinecrest Nursing with prejudice and remand for a determination of attorneys' fees and costs permitted by Chapter 74.

**WHEREFORE, PREMISES CONSIDERED**, Appellant, Pinecrest SNF, LLC d/b/a Pinecrest Nursing & Rehabilitation Center, respectfully prays that this

20

Court sustain Pinecrest Nursing's issues on appeal and REVERSE the trial court's November 25, 2014 Order overruling Pinecrest Nursing's objections to Dr. Davey's Amended Report and denying Pinecrest Nursing's Motion to Dismiss with Prejudice. Pinecrest Nursing further requests that this Court REMAND to the trial court with an order that the Baileys' claims against Pinecrest Nursing be dismissed with prejudice and to award Pinecrest Nursing its reasonable attorneys' fees and costs as allowed by Chapter 74 of the Texas Civil Practice & Remedies Code. Pinecrest Nursing further prays for such other relief that it may be justly entitled.

Respectfully submitted,

Nichol L. Bunn
State Bar No. 00790394
Nichol.Bunn@lewisbrisbois.com
Stephanie F. Erhart
State Bar No. 24007180
Stephanie.Erhart@lewisbrisbois.com
LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
2100 Ross Avenue, Suite 2000
Dallas, Texas 75201
(214) 722-7100
(214) 722-7111 (fax)

**ATTORNEYS FOR PINECREST NURSING PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER**

21

## CERTIFICATE OF SERVICE

Pursuant to TEX. R. CIV. P. 21a and TEX. R. APP. P. 25.1 (e), I hereby certify that a true and correct copy of the foregoing instrument has been served upon the following:

Robert M. Wharton
Lauren Schultz
Mary E. Green
MCIVER BROWN LAW FIRM
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
(832) 767-1673
(832) 767-1783 (fax)
firm@mciverbrown.com

BY THE FOLLOWING:

_____        Certified Mail/Return Receipt Requested
_____        Telephonic Document Transfer (Fax)
_____        Federal Express/Express Mail
_____        Hand-Delivery (In Person)
_____        First Class Mail
_____X_____        EFile (Pro Docs)

DATE:      March 11, 2015.


_____
STEPHANIE F. ERHART

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4, I hereby certify that this Appellant's Brief contains 7,088 words. This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

_____
Stephanie F. Erhart

## NO. 12-14-00357-CV

## IN THE COURT OF APPEALS FOR THE TWELFTH DISTRICT AT TYLER, TEXAS

### PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER,
*Appellant,*

v.

### TASCO BAILEY, NATHAN BAILEY, CURLIE BAILEY, ROY BAILEY, BILL BAILEY, JAMES BAILEY, EARL BAILEY, MARY DUNLAP AND LICILLE MARTIN, AS HEIRS OF ARCHIE BAILEY,
*Appellees.*

### On Interlocutory Appeal from the
### 114th Judicial District Court of Smith County, Texas
### Cause No. 14-0856-B
### The Honorable Christi Kennedy Presiding

### APPENDIX TO APPELLANT'S BRIEF

Pursuant to Rule 38.1(k) of the Texas Rules of Appellate Procedure, Pinecrest Nursing hereby submits this Appendix to its Brief containing the following items:

TAB A  Amended Expert Report and Curriculum Vitae of Christopher Davey, M.D.  (CR 141-165).

TAB B  Pinecrest Nursing's Objections to Dr. Davey's amended report and Motion to Dismiss with Prejudice.  (CR 166-192).

TAB C        November 25, 2014 Order overruling Pinecrest Nursing's objections to Dr. Davey's amended report and denying Pinecrest Nursing's Motion to Dismiss with Prejudice.  (CR 243).

TAB D        TEX. CIV. PRAC. & REM. CODE §74.351 (West Supp. 2013).

# TAB A

Electronically Filed
8/27/2014 12:04:47 AM
Lois Rogers, Smith County District Clerk

Mary Pyle, Deputy

CAUSE NO: 14-0856-B

| | | |
|---|---|---|
| TASCO BAILEY, NATHAN BAILEY, | § | IN THE DISTRICT COURT OF |
| CURLIE BAILEY, ROY BAILEY, | § | |
| BILL BAILEY, JAMES BAILEY, | § | |
| EARL BAILEY, MARY DUNLAP, | § | |
| AND LUCILLE MARTIN, AS HEIRS | § | |
| OF ARCHIE BAILEY, | § | |
| | § | |
| Plaintiffs, | § | SMITH COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| PINECREST SNF LLC D/B/A | § | |
| PINECREST NURSING & | § | |
| REHABILITATION CENTER, | § | |
| | § | |
| Defendant. | § | 114th JUDICIAL DISTRICT |

## PLAINTIFFS' NOTICE OF FILING AMENDED CH. 74 EXPERT REPORT

COME NOW PLAINTIFFS and file and serve this expert report pursuant to Chapter 74 of the Texas Civil Practice & Remedies Code. The amended expert report of Christopher Davey, MD is attached hereto as Exhibit A. The curriculum vitae of Christopher Davey, MD is attached hereto as Exhibit B.

1

Respectfully submitted,

McIver Brown Law Firm

Robert M. Wharton
Texas Bar No: 24079562
Lauren Schultz
Texas Bar No: 24071496
Mary E. Green
Texas Bar No: 24087623
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002
Telephone: 832-767-1673
Facsimile: 832-767-1783
Email: firm@mciverbrown.com
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June 2014, a true and correct copy of the foregoing instrument was served upon the following counsel of record:

Nichol L. Bunn                                    *Via Facsimile: 972-638-8664*
Amber R. Pickett
Lewis, Brisbois, Bisgaard & Smith, LLP
901 Main Street, Suite 4100
Dallas, Texas 75202

Lauren Schultz

2

# Exhibit A

I am providing this amended expert report in the Archie Bailey (also referred to herein as "the patient") matter. This report reflects my expert opinion regarding the standard of care and the proximate cause of injuries sustained by Ms. Bailey.

## Summary of Findings

It is my opinion that Pinecrest Nursing & Rehab Center (also referred to herein as "Pinecrest Nursing") breached the standard of care by allowing Ms. Bailey's intact skin to deteriorate, which developed into an infected Stage IV pressure ulcer on her sacrum during the time of her stay (TR-000002 to TR-000005, TR-000712). Ms. Bailey was admitted to Pinecrest Nursing with intact skin. The standard of care requires facilities like Pinecrest Nursing to prevent pressure ulcers from developing and to promote the healing of any pressure ulcers that do develop. Pinecrest Nursing breached the standard of care by allowing Ms. Bailey to develop a pressure ulcer and by allowing the pressure ulcer to progress to a Stage IV. Specifically, Pinecrest Nursing failed to implement adequate interventions to offload sustained pressure on Ms. Bailey's sacrum for extended periods of time. The sustained pressure caused Ms. Bailey's soft tissues to become distorted and die, which caused the Stage IV pressure ulcer. Ms. Bailey suffered harm as a result of the infected pressure ulcer, including surgical debridement, wound VAC placement, and intravenous (IV) antibiotics to treat her infections (TR-000055, TR-000311 to TR-000312, TR-000840 to TR-000842).

## Qualifications

I am a licensed physician who has actively been practicing medicine since 1981. After graduating from medical school in 1972, I did internships in cardiology, general surgery, and internal medicine and a residency in anatomical and clinical pathology. Initially I served as an emergency medicine physician at Columbia Edward White Hospital in Saint Petersburg, Florida, where I served as the Emergency Room Director for three years. Since 1987, I have actively and continuously practiced full-time Family Practice/Geriatric Medicine in office, hospital, and nursing home settings. In addition to my general adult and geriatric medicine practice, I have a special interest in skin care and wound care. As such, I have been board certified by the American Academy of Wound Management as a Wound Specialist since 1987. Currently, I practice internal medicine and geriatric medicine at the Edward White Center for Wound Care and Hyperbaric Medicine, where I have served as the Medical Director of Hyperbarics since 2011, and I hold admitting privileges at Edward White Hospital and St. Anthony's Hospital.

From 1988 to 1999, I served as the Medical Director of Heartland Nursing Home. I also served as the Medical Director of Huber Nursing Home from 1992 to 2000 and as the Medical Director of St. Pete Health Care Center from 1992 to 1995. From 1995 to 1998, I was the Medical Director of Alpine Nursing Home, and from 1995 to 1997, I was the Medical Director of Carrington Place Nursing Home. Beginning in 1996, I served as the Medical Director of Shore Acres Nursing Home for two years. I was the Medical Director of Abbey Nursing Home from 1998 to 2000 and the Medical Director of Northshore ALF from 1998 to 2002. From 2000 to 2007, I served as the Medical Director of Coquina Key Nursing and Rehabilitation Center, and from 2001 to 2005, I

1

served as the Medical Director of Westminster ALF. In addition to my ten medical director positions over the past twenty years, I have also served as a board member of the Florida Medical Director's Association. I also served/serve on the Utilization Review and Quality Assurance Committee at HCA Edward White Hospital and Columbia Edward White Hospital and on the Medical Quality and Education Committee at St. Anthony's Hospital. I have also held admitting privileges at Edward White Hospital and St. Anthony's Hospital in St. Petersburg, Florida since 1987. Since I began practicing medicine in 1981, I have overseen staff members such as nurses and nurse assistants in hospitals and nursing homes. Through these various positions, I have become very familiar with the minimum standard of care required of these healthcare providers.

By virtue of my training, education, and experience in the area of internal medicine and geriatric medicine, I have knowledge regarding the procedures, diagnoses, treatments, and conditions that are involved in this case, of the applicable standard of care, and of the opinion, which I am rendering in this amended expert report. Specifically, based on my training, education, and experience, I have direct knowledge concerning the standard of care applicable to pressure ulcer prevention, treatment orders, and patient care planning such as that care provided to Archie Bailey at Pinecrest Nursing & Rehab Center. In particular, as part of my training, education, and experience, I have provided health care to patients such as Ms. Bailey in the hospital and/or nursing home and worked with and supervised nurses, staff members, and other healthcare providers in connection with such care. Further, based on my training, education, and experience in working with and supervising nurses, nurse assistants, and other medical staff in the area of internal medicine and geriatric medicine, I have knowledge of and am familiar with the applicable standards of care as they pertain to physicians, nurses, nurse assistants, and staff regarding their duties and obligations in performing and carrying out the procedures and treatments under the circumstances at issue in this case, which led to the injuries of Ms. Bailey on 9-17-13, which contributed to her death on 12-4-13.

I have seen patients like Ms. Bailey who received care that met the applicable standards of care set forth in this report who did not develop pressure ulcers. On the other hand, I have also seen patients like Ms. Bailey where the standards of care were not met and pressure ulcers developed or got worse. Based on my training and education, I understand not just what the standard of care requires, but also what is likely to occur if the standard of care is not met. Therefore, I am qualified based on my education, training, and experience to render the opinions in this report.

Materials Reviewed

In preparing this report, I have reviewed the medical records of: (1) Pinecrest Nursing & Rehab Center, (2) Trinity Mother Frances Hospital, (3) Tyler Continue Care Hospital, (4) The University of Texas Health Science Center at Tyler, (5) Colonial Tyler Care Center, and (6) the death certificate of Ms. Bailey. I base my opinions on the items I reviewed and my knowledge of the standard of care with which I am familiar because of my education, training, and experience. These records provide a sufficient basis for my

2

opinion regarding the applicable standard of care, and that the breaches in the standards of care by Pinecrest Nursing were the proximate cause of injuries to Ms. Bailey.

Factual and Medical Background

Based on my review of the medial records referenced above, the following is a summary of events that led to Ms. Bailey's injuries.

Ms. Bailey, an 88-year-old female, was admitted to Pinecrest Nursing on 6-12-10 for long-term care for Alzheimer's disease (TR-001972). She had a history of hypertension, congestive heart failure, diabetes mellitus, and asthma (TR-001970 to TR-001971). Upon admission to Pinecrest Nursing, Ms. Bailey's skin was warm, dry, and intact (TR-002227, TR-002533). According to the documentation in the medical records, Ms. Bailey was incontinent of bowel and bladder and required total assistance with all of her Activities of Daily Living (TR-002184, TR-002252). A Braden Skin assessment was performed on 1-1-13, and Ms. Bailey was assessed as having a moderate risk for developing pressure ulcers with a score of 13 (TR-001977). She was also noted to have adequate nutrition levels (TR-001977).

On 3-20-13, nurses noted a 0.2 x 0.2 cm excoriated area to Ms. Bailey's left sacrum with granulated tissue and a scant amount of serous drainage present (TR-001983). However, by 4-3-13, this area was described as "improved" by the nursing staff, and no open areas were found (TR-001983). According to the documentation in the weekly non-pressure skin condition report, Ms. Bailey had no skin problems from April 2013 until the beginning of August 2013 (TR-001983 to TR-001988). On 8-12-13, the nursing staff at Pinecrest Nursing noted a 0.3 x 0.2 cm macerated area on Ms. Bailey's gluteal fold (TR-001989). The area of skin breakdown on Ms. Bailey's sacral area had developed a scant amount of serous exudate by 8-19-13, and nurses noted the area had "deteriorated" (TR-001989).

Several days later, on 8-22-13, a Stage II pressure ulcer was discovered on Ms. Bailey's sacral area that measured 1.0 x 0.3 cm and had a small amount of serous exudate present (TR-001978). Ms. Bailey began to experience a "continuous" and "aching" pain from her sacral ulcer on 9-3-13, and at this time, her Stage II pressure ulcer had increased in size to 0.8 x 1.0 x 0.2 cm (TR-001979). On 9-12-13, the nursing staff failed to stage the wound, but they noted measurements of 2.0 x 2.0 x 2.0 cm and the presence of serosanguineous drainage (TR-001979). By 9-17-13, Ms. Bailey had an unstageable pressure ulcer on her sacrum that measured 8.0 x 15.0 x >2.0 cm (TR-001980). According to the documentation in the weekly pressure ulcer record, the wound had a moderate amount of serosanguineous exudate and was causing Ms. Bailey a significant amount of pain (TR-001980).

On 9-19-13, Ms. Bailey was discharged from Pinecrest Nursing and transferred to Trinity Mother Frances Hospital for elevated white blood cell count of 20.6 thou/mm³ (TR-000002, TR-001972, TR-002528). Upon admission to the ER at Trinity Mother Frances Hospital, Ms. Bailey was diagnosed with a Stage IV decubitus ulcer on her sacrum,

3

leukocytosis, and a urinary tract infection (UTI) (TR-000002, TR-000005). Cultures taken from the wound on her sacrum later revealed the presence of *Proteus mirabilis* (TR-000007, TR-000712). She also had a Stage II pressure ulcer on her left buttock (TR-000026). That same day, Ms. Bailey was transferred to Tyler Continue Care Hospital for further management of her wounds (TR-000006, TR-000061).

Upon admission to Tyler Continue Care Hospital, Ms. Bailey had a Stage IV sacral ulcer that measured 11.0 x 12.0 x 3.0 and had a foul odor (TR-000285, TR-000483). The wound had a small amount of green purulent drainage and was covered in black eschar (TR-000285, TR-000930). Ms. Bailey also had a Stage II pressure ulcer on her left buttock that measured 3.0 x 3.0 x 0.25 cm and a Stage II pressure ulcer on her right buttock that measured 5.0 x 5.0 x 0.1 cm (TR-000285). Both buttock wounds had a small amount of serosanguineous drainage present (TR-000285). According to her dietary consult on 9-20-13, Ms. Bailey was malnourished, and her nutritional status was described as "severely compromised" (TR-000285). Her lab values from 9-19-13 revealed an albumin of 2.4 g/dL, for which a normal range is 3.9-5.0 g/dL, and a pre-albumin of 58 mg/L, for which a normal range is 176-360 mg/L (TR-000011, TR-000283, TR-000701, TR-002529). Ms. Bailey's low pre-albumin level suggested severe visceral protein depletion (TR-000283).

According to the wound care consult on 9-24-13, the pressure ulcer had a "foul malodorous odor," and the surrounding peri-wound area had excoriated non-blanchable redness (TR-000842). On 9-26-13, Ms. Bailey underwent excisional debridement of necrotic tissue from her sacral wound as well as partial excision of portions of bone of the involved coccyx (TR-000311 to TR-000312). The bone sample later revealed reactive changes and acute inflammation, indicating possible osteomyelitis (TR-000448). Following debridement, the wound measured 11.5 x 8.0 x 6.0 cm with moderate serosanguineous drainage and 5.0 cm of undermining, and the two buttocks wounds had become part of the sacral wound (TR-000842, TR-000908 to TR-000909). A wound VAC was placed on the sacral ulcer to promote healing, and IV antibiotics were administered to treat Ms. Bailey's infections (TR-000055, TR-000167, TR-000842).

On 9-30-13, Ms. Bailey underwent another surgical debridement of her Stage IV pressure ulcer, and following the procedure, the wound measured 11.0 x 7.0 x 7.0 cm (TR-000842). The wound VAC was changed, and the negative pressure treatment was continued (TR-000842). Ms. Bailey's sacral ulcer was debrided two more times before her discharge on 10-22-13 (TR-000840 to TR-000841).

On 10-22-13, Ms. Bailey was admitted to Colonial Tyler Care Center for continued wound care and nutritional therapy (TR-002566 to TR-002569). She continued to receive negative pressure therapy from a wound VAC as well as a therapeutic diet to promote wound healing (TR-002617, TR-002635). As of 11-6-13, Ms. Bailey's sacral pressure ulcer measured 11.0 x 9.0 x 6.0 cm (TR-002644). Unfortunately, her condition failed to improve, and she was placed on hospice care. On 12-4-13, Ms. Bailey expired from cardio pulmonary arrest, as indicated on her death certificate (TR-002743). However, it is my opinion, to a reasonable degree of medical probability, that Ms.

4

Bailey's large and infected pressure ulcer was a significant, contributing factor to her death.

Following my review of the medical records in this matter, it is my opinion that the staff at Pinecrest Nursing violated the standard of care. For the purpose of this report, I will discuss the standard of care, breach of standard of care, and proximate causation.

<u>Pinecrest Nursing & Rehab Center</u>

<u>Relevant Standards of Care</u>

**First: Prevent Avoidable Pressure Ulcers.** Medicare and Medicaid provide rules that require long term care facilities to provide a base level of care. Failure to meet the level of care provided by the rules found in 42 CFR 483. Subpart B is a violation of the regulations intended to protect residents. It is also an indication of a violation of the standard of care by the staff of the facility and the administration of the facility. Section 483.25(c)(1) provides that a facility and its nurses ensure that a resident who is admitted without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that the sores were unavoidable and that a resident who develops pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing. The purpose of this is to prevent residents from getting pressure ulcers and to promote behavior that allows for the healing of decubitus ulcers. There are a number of interventions that exist to prevent pressure sores that are identified and explained in more detail below. For example, the standard of care requires that a patient be turned, provided with pressure-relieving devices, be kept clean and dry, and be kept properly nourished. The standard of care also requires that a patient receive frequent head-to-toe body examinations to look for early signs of skin problems.

One additional source regarding the standard of care is the National Pressure Ulcer Advisory Panel. The NPUAP is a collection of experts tasked with creating treatment algorithms that show the proper method for preventing pressure ulcers. In 2009, the NPUAP published a 26-page reference guide on how to prevent pressure ulcers. This reference guide, which is available under the educational and clinical resources tab of the NPUAP website (www.npuap.org), provides a detailed description of what the standard of care requires.

The NPUAP identifies eight things that health care providers should address when caring for a patient at risk of developing pressure ulcers:

1.    Pressure ulcer risk assessment: The standard of care requires health care providers to conduct a structured risk assessment on admission and as frequently and as regularly required based on patient acuity. In addition, health care providers should reassess the patient's risk level if the patient has a change in condition. The purpose of the assessments is to gauge the patient's risk of developing a pressure ulcer and to ensure a proper plan of

5

06/26/14   05:32PM   H7 LASERJET FAX   7279871966   P.06

care is implemented to prevent a pressure ulcer from developing.

2. Skin assessment: Likewise, the standard of care requires health care providers to perform assessments to determine the integrity of the patient's skin and to determine whether a change in the care plan is necessary. Skin assessments should be performed regularly, although the frequency of inspection may need to be increased if there is any deterioration in the patient's overall condition.

3. Skin care: The standard of care requires providers to care for the skin in a manner that prevents breakdowns. This includes, for example, not turning a patient onto a body part that is still reddened from a previous episode of pressure loading.

4. Nutrition: Because a decline in nutritional status can lead to skin breakdown, the standard of care requires providers to ensure patients are receiving adequate nutrition. This includes offering high-protein supplements and/or tube feeding, in addition to the usual diet, to patients with nutritional risk. It is important that health care providers communicate with the dietary team to ensure the patient does not become malnourished.

5. Repositioning: The standard of care also requires providers to frequently and regularly reposition patients to prevent sustained pressure being applied to the same part of the body for an extended period of time.

6. Mattress and bed use: Because special devices can also offload pressure to parts of the body, the standard of care requires providers to install special devices, such as low air mattresses, for high-risk residents.

7. Support surfaces while seated: For high-risk patients, the standard of care requires health care providers to consider and use support surfaces, such as wheelchair cushions, to offload pressure to parts of the body while the patient is seated.

8. Other support surfaces: The standard of care also requires providers to avoid devices that would promote skin breakdowns, such as cutout, ring or donut-type devices.

Failing to do any of the above is a breach of the standard of care.

Second: Properly treat pressure ulcers. The standard of care also requires that a resident who has pressure sores must receive the necessary treatment and services to promote healing and prevent infection. This standard of care is supported by Title 42, Code of Federal Regulations, Section 483.25(c)(2). The purpose of this requirement is to promote behavior that allows for the healing of decubitus ulcers. There are a number of

6

06/26/14   05:33PM   NJ LAFAYETT FAX   727827966   P.07

interventions that exist to promote healing and prevent further skin breakdown. For example, the standard of care requires that a patient be positioned so that pressure on the ulcer is relieved, the patient is kept clean and dry, and the patient is provided with adequate nutrition to support healing. The pressure ulcer and surrounding skin should also be cleansed at the time of each dressing change. Appropriate dressing and treatments should be used, or the ulcer is unlikely to heal, as was the case here. The standard of care also requires that a facility and its nurses intervene such that a patient who has ulcers heals. The standard of care also requires that regular and complete assessments be performed and documented so that the necessary interventions can be implemented. Failing to do any of the above is a breach of the standard of care.

Third: Implement 40 Texas Admin. Code, Rule 19.001. Another source of requirements that nursing homes must meet is Title 40, Chapter 19 of the Texas Administrative Code. The Texas Administrative Code, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001 states (a) the facility must have sufficient staff to provide 24-hour nursing and related services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, as determined by resident assessments and individualized plans of care. When treating a patient with a high risk of developing pressure ulcers, a facility and its agents must properly and regularly assess the patient, including daily and complete skin assessments, proper documentation of the patient's daily activities, and monitoring the patient's body weight. Such accurate and complete documentation is necessary to properly assess and implement optimal nursing interventions. In addition, staffing levels should reflect the complexity of the care required, the size of the facility, and the type of services delivered. This means that the training, selection, and supervision of the staff must be sufficient to handle the nursing care that is needed by the residents who are accepted into the facility.

The history behind the nursing home regulations informs about its purpose. In the past, most nurses in nursing homes had little or no formal training in gerontology and long-term care (IOM, 1986). Many nursing home attendants or aides had no formal training. In 1986, only 17 states had mandated training requirements for nursing attendants, and there were no federal standards for training (IOM, 1986). In a 1986 study, conducted at the request of Congress, the Institute of Medicine found that residents of nursing homes were being abused, neglected, and given inadequate care. The Institute of Medicine proposed sweeping reforms, most of which became law in 1987 with the passage of the Nursing Home Reform Act, part of the Omnibus Budget Reconciliation Act of 1987. The basic objective of the Nursing Home Reform Act was to ensure that residents of nursing homes received quality care that resulted in their achieving or maintaining their "highest practicable" physical, mental, and psychosocial well-being.

Fourth: Implement The Nursing Home Reform Act of 1987. To secure quality care in nursing homes, the Nursing Home Reform Act requires the provision of certain services to each resident and establishes a Residents' Bill of Rights. Nursing homes receive Medicaid and Medicare payments for long-term care of residents only if they are certified by the state to be in substantial compliance with the requirements of the Nursing Home

7

Reform Act. The purpose of those reforms was to ensure that facilities had sufficient staff that was sufficiently trained and supervised to provide quality care to the residents. Such training and supervision are especially important when it comes to care of dependent residents. Failing to have a staff that is sufficiently trained and supervised, which includes the facilities policies as well as the implementation of those policies, to attain and maintain the highest practicable physical, mental and psychosocial well-being of the residents is a violation of the standard of care applicable to nursing homes.

<u>Breaches of Standards of Care</u>

Over the course of the care of Ms. Bailey, it is clear that Pinecrest Nursing violated the standard of care in the following respects:

First: Failing to prevent a pressure sore;
Second: Failing to properly treat the patient's pressure ulcers once they developed;
Third: Failing to implement The Texas Administrative Code, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001; and
Fourth: Failing to implement The Nursing Home Reform Act of 1987.

First: Pinecrest Nursing violated the standard of care by failing to prevent a pressure ulcer from occurring, which was a proximate cause of harm to Ms. Bailey. This standard of care mandates that a facility and its nurses ensure that a resident who is admitted without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable and that a resident who has pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing. Ms. Bailey was admitted to Pinecrest Nursing without any pressure ulcers (TR-002227, TR-002533). The Braden Skin Score is used to assess a resident's risk for developing pressure ulcers. According to Pinecrest Nursing, Ms. Bailey was not a high risk of developing pressure ulcers with a Braden Score of 13 (TR-001977). On 7-1-13, the nursing staff assessed Ms. Bailey as only being a moderate risk for the development of pressure ulcers (TR-001977). In my professional opinion, this is not an accurate assessment of Ms. Bailey's risk level. At the time of this assessment, Ms. Bailey required extensive assistance for all her Activities of Daily Living, including bed mobility, and she had a history of generalized weakness and debility, which would have severely limited her from freely repositioning herself (TR-002018 to TR-002019, TR-002184, TR-002252 to TR-002253). Despite those factors, she was assessed as "chairfast" when she should have been assessed as "bedfast" (TR-001977). Furthermore, given Ms. Bailey's age, her skin would have been thin, dry, and susceptible to friction and shear; yet, the Braden Skin assessment described her as having only a "potential problem" for friction and shear (TR-001977, TR-002252 to TR-002253). She was also incontinent of bowel and bladder, which would have significantly increased her risk for skin breakdown (TR-002254). With such inaccurate assessments, the nursing staff at Pinecrest Nursing would not have initiated the appropriate interventions required for Ms. Bailey's actual risk level. Because Ms. Bailey actually had a high risk of developing pressure ulcers, Pinecrest Nursing had the duty to institute interventions to prevent skin breakdown, such as those recommended by the NPUAP.

8

There is no evidence within the medical records that adequate preventive measures, such as those recommended by the NPUAP, were implemented to prevent Ms. Bailey's sacral ulcer from developing. Despite Ms. Bailey's high risk for skin breakdown, nothing in the medical records suggests that the nurses were frequently turning and repositioning her, even after skin breakdown was discovered on her sacrum (TR-001978 to TR-001989, TR-002030 to TR-002076). By 6-1-13, Ms. Bailey was completely dependent on the nursing staff for all of her Activities of Daily Living, and she required extensive assistance to change positions while in bed (TR-002252). With a resident like Ms. Bailey, nurses should be repositioning the resident at least once every two hours. However, the medical records fail to present any evidence that Ms. Bailey's turning/repositioning schedule was ever documented, which suggests she was not repositioned every two hours as required by the standard of care (TR-002030 to TR-002076). Over the course of Ms. Bailey's entire stay at Pinecrest Nursing, there are no entries in the nursing notes indicating the resident was ever repositioned (TR-002030 to TR-002058). Similarly, there is no evidence within the medical records that any special devices were used to offload pressure from Ms. Bailey's sacral area until after she developed a pressure ulcer (TR-001978, TR-002030 to TR-002076). Although Ms. Bailey developed skin breakdown on 8-12-13, a low air mattress was not mentioned until 8-22-13, when the nursing plan of care was updated (TR-001989, TR-002098). Even though a low air loss mattress was mentioned in this revised plan of care, the medical records do not reflect that the nurses ever initiated and followed through with this intervention (TR-002030 to TR-002076).

Furthermore, there is no evidence in the medical records that Ms. Bailey's skin was regularly, appropriately, and timely assessed and that such assessments were accurately and completely documented to implement optimal and necessary interventions to prevent the occurrence of a pressure ulcer (TR-001981 to TR-001989, TR-002030 to TR-002076). Not only did the nurses at Pinecrest Nursing inaccurately assess Ms. Bailey's risk of pressure ulcer development, they failed to implement an appropriate plan of care to prevent skin breakdown (TR-001977, TR-002094 to TR-002098). Care plan meetings were held on 1-17-13 and 4-11-13, but Ms. Bailey's risk of skin breakdown was never discussed (TR-002094, TR-002097). Although "preventative care" was mentioned in the 4-10-13 nursing plan of care regarding Ms. Bailey's skin integrity, the nursing staff failed to list any specific interventions (TR-002095). On 8-12-13, a "macerated area" was discovered on Ms. Bailey's gluteal fold (TR-001989). Despite this change in condition, the nursing plan of care was not updated, and specific interventions were not listed, until 8-22-13 (TR-002098). By this time, Ms. Bailey had already developed a Stage II pressure ulcer (TR-001978). While this change in condition was documented in the non-pressure ulcer report, it was never mentioned in any of the entries in the nursing notes (TR-001989, TR-002030 to TR-002076). Not only is accurate and complete documentation necessary to properly assist and properly implement optimal nursing interventions, it is crucial to monitor skin breakdown and track a wound's progress. The medical records here demonstrate both inaccurate and inconsistent documentation. If Pinecrest Nursing and its nursing staff had properly assessed and documented Ms. Bailey's skin breakdown, and properly updated the plan of care, the appropriate

9

interventions could have been implemented before the skin breakdown on Ms. Baily's sacrum became a severe pressure ulcer (TR-001978 to TR-001980, TR-001989). Because the nurses and staff did not ensure that Ms. Bailey, who entered the facility with intact skin, did not develop a pressure ulcer, the facility and the nurses breached the standard of care.

Second: Pinecrest Nursing violated the standard of care by failing to promote the healing of Ms. Bailey's sacral pressure ulcer. If a resident has already developed pressure ulcers, appropriate nursing interventions can be implemented to promote the healing of these ulcers. While progress is slow, continued care and treatment can prevent complications such as further tissue damage, infection, and pain. After reviewing the medical records, it is clear that the assessments, treatments, and interventions described above were not performed here. First, once the skin breakdown was discovered on Ms. Bailey's sacrum on 8-12-13, the nursing staff at Pinecrest Nursing should have been frequently monitoring the area of skin breakdown, documenting any changes in condition, and describing the progression of the wound. Instead, the nurses waited a week to reassess Ms. Bailey's area of skin breakdown, and by that time, it had deteriorated into a Stage II pressure ulcer (TR-001978, TR-001989). On 9-12-13, the nurses assessed the pressure ulcer as measuring 2.0 x 2.0 x 2.0 cm, but they failed to stage it (TR-001979). Five days later, Ms. Bailey's sacral ulcer had become unstageable (TR-001980). When an ulcer is classified as unstageable, it means that the ulcer is at least Stage III or Stage IV, but the ulcer is heavily covered in necrotic tissue, preventing health care providers from seeing how deep the injury extends under the skin. On 9-17-13, Ms. Bailey's unstageable pressure ulcer measured 8.0 x 15.0 x >2.0 cm with a moderate amount of serosanguineous drainage, according to the documentation in the weekly pressure ulcer record (TR-001980). That same day, the wound was assessed for the first time in the nursing notes, and the entry described the wound as "deteriorated" with measurements of 18.0 x 10.0 cm (TR-002053). According to the nursing notes, the wound had 100% necrotic tissue, and its depth was unable to be measured (TR-002053). The medical records here demonstrate both inaccurate and inconsistent documentation. Proper assessment is necessary for proper treatment of pressure ulcers. Measurement and accurate description of wounds is crucial to track a wound's progress and response to treatment. By the time Ms. Bailey transferred to the ER at Trinity Mother Frances Hospital, she had an infected Stage IV pressure ulcer (TR-000002 to TR-000005). If Pinecrest Nursing and its nurses had properly assessed and documented Ms. Bailey's pressure ulcer, the appropriate interventions could have been implemented before the wound progressed to a Stage IV pressure ulcer (TR-TR-000002 to TR-000005).

Not only is accurate and complete documentation necessary to properly assess and properly implement optimal nursing interventions, it also assists other members of the facility, such as physicians and dieticians, to treat the patient's conditions promptly and correctly. The nursing staff at Pinecrest Nursing failed to regularly assess Ms. Bailey's pressure ulcer as indicated by the lack of skin and wound care assessments in the nursing notes (TR-002030 to TR-002076). Because the nurses failed to accurately and consistently document the status of Ms. Bailey's pressure ulcer and provide adequate and detailed descriptions, the attending physician was not notified of Ms. Bailey's worsening

10

pressure ulcer for over two weeks (TR-002048). As a result, a wound care consultation and wound care treatments were not ordered for Ms. Bailey until after her sacral ulcer had developed a depth of 0.2 cm, which was indicative of a Stage III pressure ulcer (TR-001979, TR-002001 to TR-002002, TR-002048, TR-002531). Aside from these orders, Ms. Bailey's pressure ulcer was never mentioned in any of the physician's progress notes or consultations (TR-001990 to TR-001992). The nurses caring for Ms. Bailey should have brought the wound and the fact that it was becoming necrotic to the attending physician's attention, both by accurately documenting their assessment of the wound in the records and by verbally reporting it to one of the physicians. Nurses are required to relay a patient's changes in condition to the attending physician, such as further skin breakdown, such that a physician could evaluate the necessity of interventions such as a low air mattress or a wound consult. If the nurses at Pinecrest Nursing had notified the attending physician of Ms. Bailey's change in condition sooner, the proper interventions could have been implemented before Ms. Bailey's pressure ulcer became unstageable (TR-001980).

Finally, the nursing staff at Pinecrest Nursing should have paid closer attention to Ms. Bailey's nutritional status. In order to promote skin integrity, it is vital that a resident receives adequate nutrition and hydration. As mentioned in the medical summary, Ms. Bailey was admitted to Pinecrest Nursing with adequate nutrition levels (TR-001977). Despite Ms. Bailey's development of a pressure ulcer, the nursing staff at Pinecrest Nursing failed to monitor the resident's laboratory values (TR-002519 to TR-002529). As a result, the nurses were unable to assess Ms. Bailey's nutritional status, and were therefore unaware of her worsening albumin and pre-albumin levels throughout her stay at Pinecrest Nursing. While a multivitamin was administered, additional interventions such as providing snacks between meals, fortifying meals, and/or providing smaller, more frequent meals were never initiated (TR-002000). Pressure ulcer development or the presence of a chronic non-healing pressure ulcer places increased metabolic demands on a patient. Without immediate and assertive nutritional intervention to provide the raw materials to meet this increased demand for energy, initiate wound closure, and replace potential losses during the wound healing process, healing will be delayed. Ms. Bailey's lab values were not taken until 9-19-13, the day of her discharge (TR-002529). By this time, she had an albumin level of 2.4 g/dL, indicating malnutrition (TR-002529). Upon admission to the ER at Trinity Mother Frances Hospital, she was diagnosed with protein calorie malnutrition and had a pre-albumin level of 58 mg/L (TR-000011, TR-000057). The failure of the nurses to institute appropriate interventions required to stabilize Ms. Bailey's skin integrity, maintain her nutritional status, and prevent complications was clearly a breach in the standard of care.

Third: Pinecrest Nursing violated the standard of care by failing implement The Texas Administrative Code, Title 40, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001 by not providing sufficient staff to provide 24-hour nursing care and related services reflecting the complexity of the care required, the size of the facility, and the type of services necessary to attain or maintain the highest practicable physical, mental and psychosocial well-being of Ms. Bailey, as determined by the resident assessments and individualized plans of care. When a resident does not

11

receive frequent and regular assessments and care, it is indicative of an insufficient staff level. If staffing levels had been appropriate, there would have been nurses and/or staff available to attend to Ms. Bailey. The failure of the facility to provide sufficient staff and to provide 24-hour nursing care and related services is a breach in the standard of care.

Fourth: Pinecrest Nursing violated the standard of care applicable to nursing homes by failing to properly train and supervise its staff and by failing to have policies in place that are designed to maintain the highest practicable physical, mental, and psychosocial well-being of Ms. Bailey. Had the care to Ms. Bailey been provided by sufficiently trained staff and based on well-conceived policies and procedures, appropriate and timely care plans would have been implemented and interventions would have been put in place which would have prevented Ms. Bailey from developing a Stage IV pressure ulcer (TR-000002 to TR-000005). As a result, Pinecrest Nursing breached this standard of care.

## Causation

The following is an explanation of how, to a reasonable degree of medical probability, the breaches of the standard of care identified above proximately caused Ms. Bailey's injuries, including the development of a Stage IV pressure ulcer.

To understand how a pressure ulcer is caused by the negligence of a nursing staff and a facility, it is first important to understand what a pressure ulcer is and what happens to the body to allow them to develop.

### What is a pressure ulcer?

Pressure ulcers, also known as decubitus ulcers or bedsores, are localized injuries to the skin and/or underlying tissue usually over a bony prominence, as a result of pressure, or pressure in combination with shear and/or friction. Most commonly they are found on the sacrum, coccyx, heels or the hips, but other sites such as the elbows, knees, ankles, or the back of the cranium can be affected. They range in severity from mild (minor skin reddening) to severe (deep craters down to muscle and bone).

### What causes a pressure ulcer to develop?

Pressure ulcers occur when soft tissues are distorted in a fixed manner over a period of time. This distortion usually occurs when the soft tissues are compressed and/or sheared between the skeleton and a supportive device (such as a bed or chair). This causes the blood vessels within the distorted tissue to become compressed, angulated, or stretched out of their usual shape. As a result, blood is unable to pass through the vessels. When blood is unable to pass through the vessels, the distorted tissues become ischemic. Ischemia is the shortage of oxygen and nutrients needed to keep tissue alive. If ischemia occurs for an extended length of time, then death of the tissue occurs, a process known as necrosis.

12

Other factors cause pressure ulcers, too. If a person slides down in the bed or chair, blood vessels can stretch or bend and cause pressure ulcers. Even slight rubbing or friction on the skin may cause minor pressure ulcers.

*How does the failure to comply with the standard of care cause severe pressure ulcers?*

The standards of care discussed above related to preventing pressure ulcers all focus on identifying those at risk for the development of pressure ulcers and providing the interventions necessary to prevent the development of the ulcers. When a facility or its nurses fail to have, enforce, or enact the appropriate measures to assess a person's risk for developing a pressure ulcer, then the person does not receive the necessary care to prevent the development of ulcers. When a facility or its nurses fail to have, enforce, or enact the appropriate interventions to prevent the development of ulcers, then the patient or resident is more likely than not going to develop ulcers.

Once an ulcer develops, the standard of care shifts from prevention to treatment, as detailed above. According to the recommendation of the National Pressure Ulcer Advisory Panel (NPUAP) Consensus Development, the following describes the staging of pressure ulcers:

Stage 1
Nonblanchable erythema of intact skin, the heralding lesion of skin ulceration. In individuals with darker skin, discoloration of the skin, warmth, edema, induration, or hardness may also be indicators. A Stage I pressure ulcer is an observable pressure related alteration of intact skin whose indicators as compared to the adjacent or opposite area on the body may include changes in one or more of the following: skin temperature (warmth or coolness), tissue consistency (firm or boggy feel) and/or sensation (pain, itching). The ulcer appears as a defined area of persistent redness in lightly pigmented skin, whereas in darker skin tones, the ulcer may appear with persistent red, blue, or purple hues.

Stage 2
Partial thickness skin loss involving epidermis, dermis, or both. The ulcer is superficial and presents clinically as an abrasion, blister, or shallow crater.

Stage 3
Full thickness skin loss involving damage to or necrosis of subcutaneous tissue that may extend down to, but not through, underlying fascia. The ulcer presents clinically as a deep crater with or without undermining of adjacent tissue.

Stage 4
Full thickness skin loss with extensive destruction, tissue necrosis, or damage to muscle, bone, or supporting structures (e.g., tendon, joint capsule). Undermining and sinus tracts also may be associated with Stage

13

4 pressure ulcers.

<u>Unstageable/Unclassified</u>
Full thickness tissue loss in which the base of the ulcer is completely covered by slough (yellow, tan, gray, green or brown) and/or eschar (tan/brown or black) in the wound bed. Until enough slough and/or eschar is removed to expose the base of the wound, the true depth and stage cannot be determined. However, it will be either a Stage III or Stage IV.

<u>Suspected Deep Tissue Injury</u>
Purple or maroon localized area of discolored intact skin or blood-filled blister due to damage of underlying soft tissue from pressure and/or shear. The area may be preceded by tissue that is painful, firm, mushy, boggy, warmer or cooler as compared to adjacent tissue. Deep tissue injury may be difficult to detect in individuals with dark skin tones. Evolution may include a thin blister over a dark wound bed. The wound may further evolve and become covered by thin eschar. Evolution may be rapid exposing additional layers of tissue even with optimal treatment.

The standards of care related to treatment are intended to prevent ulcers from progressing from a Stage I or Stage II wound to a Stage III or Stage IV wound. When insufficient care is provided to treat ulcers and the ulcer progresses to a Stage III or a Stage IV wound, then the patient or resident suffers a number of complications directly caused by the failure to assess, prevent, and treat ulcers.

*How do severe pressure ulcers impact residents and patients?*

First, and most obviously, Stage III and Stage IV pressure ulcers impact the skin. These ulcers cause skin loss with extensive destruction, tissue necrosis, and damage to muscle, bone, tendons, and other supporting structures. Second, patients and residents who have severe ulcers have an increased morbidity and mortality rate. Third, patients and residents who have severe ulcers become susceptible to infection and other medical complications related to the wound and its treatment. Fourth, the patients and residents who develop severe ulcers have problems with pain and loss of dignity associated with the wound and its treatment.

*How did the breaches of the standard of care in this case cause Ms. Bailey to develop a severe pressure ulcer?*

In my opinion, to a reasonable degree of medical probability, the breaches of the standard of care discussed above related to the assessment, prevention, and treatment of severe pressure ulcers were the proximate cause of Ms. Bailey's severe pressure ulcer. As stated above, Pinecrest Nursing and its nursing staff failed to reposition Ms. Bailey every two hours, keep her skin clean and dry, and implement other appropriate interventions to relieve pressure and promote skin integrity. Pinecrest Nursing and its nursing staff also failed to properly treat the pressure ulcer and encourage its healing once it developed.

14

Because Pinecrest Nursing failed to reposition her every two hours and failed to implement effective interventions, Ms. Bailey had sustained pressure on her sacral area, which caused the blood to stop flowing to that part of the body and the skin to distort. Because of the lack of blood flow, the tissue died, causing Ms. Bailey to develop an infected Stage IV pressure ulcer (TR-000002 to TR-000005, TR-000280).

*How did the severe pressure ulcer in this case impact Ms. Bailey?*

In my opinion, Ms. Bailey's severely infected Stage IV pressure ulcer was a proximate cause of harm and a major contributing factor to her death on 12-4-13. Pressure ulcers have a profound impact on lives: (1) physically, (2) socially, (3) emotionally, and (4) mentally. Pressure ulcers are associated with pain, fluid leakage, smell, discomfort, difficulties with mobility, and a decrease in appetite. Due to the severity of her pressure ulcer, Ms. Bailey was required to endure multiple surgical debridements of her sacral ulcer as well as placement of a wound VAC (TR-000055, TR-000311 to TR-000312, TR-000870). Because Ms. Bailey's sacral pressure ulcer became infected with *Proteus mirabilis* and she developed osteomyelitis, she required aggressive IV antibiotic therapy for treatment of her infections (TR-000311 to TR-000312, TR-000448, TR-000712). Based on the medical records, I am also able to opine that Ms. Bailey's pressure ulcer caused her significant pain (TR-001979 to TR-001980, TR-002636).

### Conclusion

Accordingly, it is my expert opinion that the breaches of the standard of care by Pinecrest Nursing were proximate causes of severe injury and harm to Ms. Bailey. Absent the breaches in the standard of care, to a reasonable degree of medical probability, the patient would not have suffered from a severe Stage IV pressure ulcer, *Proteus mirabilis* wound infection, osteomyelitis, and malnutrition, all of which contributed to her death on 12-4-13 (TR-000055 to TR-000057, TR-000311 to TR-000312, TR-000712). I hold all of the opinions expressed in this report to a reasonable degree of medical certainty.

Christopher Davey, MD

# Exhibit B

# Curriculum Vitae



## Christopher M. Davey, M.D., P.A.
2191 9th Ave. North, Suite 115
Saint Petersburg, FL 33713
(727) 321-1234 office  (727) 827-2966 fax
(727) 641-4501 cell
cdavey1@tampabay.rr.com

Dr. Davey trained as a pathologist at Mount Sinai Medical Center in Miami, Florida but since 1987 has practiced in Family Practice and Geriatric Medicine in office, hospital, and nursing home settings. He has held hospital privileges in Family Practice since 1987 at Edward White Hospital and St. Anthony's Hospital in St. Petersburg, Florida. He is advanced cardiac life support certified He has a special interest in wound diagnosis, prevention and treatment. He is Board certified by the American Academy of Wound Management as a Certified Wound Specialist (CWS) and is a trained Hyperbaric specialist. (Hyperbaric medicine is the treatment of severe wounds and other conditions using high pressure oxygen chambers). He is the Medical Director of Hyperbaric Medicine as well as an active physician at the Edward White Center for Wound Care and Hyperbaric medicine.

Dr. Davey has testified extensively for both plaintiff and defense in cases involving geriatric issues, falls, wounds ("wounds" includes bedsores and pressure ulcers amongst others), complex medical cases and standards of care. His pathology background gives him the expertise to render opinions on cause of death issues.

## Personal
| | |
|---|---|
| Date of Birth: | December 19, 1946 |
| Place of Birth: | London, England |
| Fla. Medical License Number: | ME-034037 |
| DEA Number: | AD8602371 |
| Languages Spoken: | English, French, and German |

## Education

**Medical School:**

| | |
|---|---|
| 1968-1972 | St. Mary's Hospital, London University, England (Now: Imperial College, London) |

Page 1 of 6

**Internship:**

| | |
|---|---|
| 1972-1973 | Northwick Hospital and Research Center<br>Harrow, Middlesex, England<br>-Cardiology<br>-General Surgery |
| 1973-1977 | Princess Margaret Hospital, Nassau,<br>Bahamas (on a British Government Aid<br>Program)<br>-Internal Medicine with special interest in<br>Marine Medicine |

**U.S. Residency:**

| | |
|---|---|
| 1977-1980 | Mt. Sinai Hospital<br>Miami, Florida<br>-Pathology: Anatomical and Clinical |

## Professional Experience:

| | |
|---|---|
| 1981-1987 | Columbia Edward White Hospital<br>2323 9th Avenue<br>Saint Petersburg, Florida 33713<br>-Emergency Medicine: including<br>three years as Emergency Room Director |
| 1987-Present | Private Practice<br>2191 9th Ave. North Ste 115<br>Saint Petersburg, Florida 33713<br><br>-Adult and Geriatric Medicine<br>-Special Interest in Skin Care and Wound<br>Care including on staff at the Center for<br>Wound Care and Hyperbaric Medicine at<br>Edward White Hospital. |

**Page 2 of 6**

**Hospital Affiliation:**
**(Active Medical Staff)**
**(Dept of Family Practice):**

Columbia Edward White Hospital
2323 9th Avenue
Saint Petersburg, Fl 33713


St. Anthony's Hospital
1200 7th Avenue
Saint Petersburg, Fl 33705


**Board Certification:**

Board certified by the American Academy of
Wound Management as a Certified Wound Specialist
(CWS).


**Memberships and Positions Held:**

| | |
|---|---|
| 1989-1994: | Member of the Board of Trustees, Columbia Edward White Hospital |
| Previous: | Board Member of the Florida Medical Directors Association |
| Previous: | Medical Director of Sunrise Northshore, Assisted Living Facility and Nursing Home |
| Previous: | Utilization Review and Quality Assurance Committee member at St. Anthony's Hospital |
| Previous: | Member of Florida Medical Directors Association |
| Previous: | Certified Medical Director (AMDA) |

**Page 3 of 6**

Present:                    Medical Director for Hyperbaric Medicine
                            Center for Wound Care
                            HCA Edward White Hospital

Present:                    Utilization Review and Quality
                            Assurance Committee member at Columbia
                            Edward White Hospital

Present:                    Member of American Geriatrics Society and
                            Florida Geriatrics Society

Present:                    Member of Association for
                            Advancement of Wound Care (national
                            organization)

Present:                    Member of the Society of University
                            Founders of the University of Miami,
                            Coral Gables, Florida

Present:                    Member of the Medical/Surgical Care
                            Evaluation Committee at
                            Edward White Hospital

Present:                    Member of the Infectious Control
                            Committee at Edward White Hospital

Present:                    Member of the Medical Quality and
                            Education Committee at St. Anthony's
                            Hospital

Present:                    Member of the Florida Medical Association

## Publications:

Former Editor and Contributor of
"Journal of the Florida Medical Directors
Association" (circulation of about 1,000)

Former Co-Editor of "Journal of Florida Geriatrics
Society"

## Nursing Home Medical Directorship, Past
(All dates approximate)

| | |
|---|---|
| Huber Nursing home | 1992-2000 |
| Greenbrook Nursing Home | 1994-1999 |
| Heartland Nursing Home | 1988-1999 |
| Carrington Place Nursing Home | 1995-1997 |
| Coquina Key Nursing & Rehabilitation Center | 2000-2007 |
| St. Pete Health Care Center | 1992-1995 |
| Northshore ALF | 1998-2002 |
| Alpine Nursing Home | 1995-1998 |
| Abbey Nursing Home | 1998-2000 |
| Shore Acres Nursing Home | 1996-1998 |
| Westminster ALF | 2001-2005 |

**\* CV last updated 8/2011**

51

# TAB B

CAUSE NO. 14-0656-B

| | | |
|---|---|---|
| TASCO BAILEY, NATHAN BAILEY, CURLIE BAILEY, ROY BAILEY, BILL BAILEY, JAMES BAILEY, EARL BAILEY, MARY DUNLAP AND LUCILLE MARTIN, AS HEIRS OF ARCHIE BAILEY | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | SMITH COUNTY, TEXAS |
| | § | |
| PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER | § | |
| | § | |
| *Defendants.* | § | 114TH JUDICIAL DISTRICT |

### DEFENDANT PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER'S OBJECTIONS TO THE AMENDED CHAPTER 74 REPORT OF CHRISTOPHER M. DAVEY, M.D.

COMES NOW, PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER ("Defendant"), Defendant in the above entitled and numbered cause, and files its Objections to the Amended Chapter 74 Report of Christopher M. Davey M.D. In support thereof, Defendant would respectfully show the Court as follows:

### I.
### BACKGROUND

1.      This is a health care liability claim arising from the care and treatment of Archie Bailey ("Decedent"). Specifically, Plaintiffs claim that Defendant was negligent in providing nursing care to Decedent during her residency at Defendant's facility thereby resulting in the development of pressure sores which became infected and contributed to Decedent's death. As such, this lawsuit is governed by Chapter 74 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

2. In an attempt to comply with the statutory requirements of Chapter 74, Plaintiffs served an expert report and curriculum vitae ("CV") of Christopher M. Davey, M.D. ("Dr. Davey"). *See*, Dr. Davey's report and CV on file with the Court and incorporated herein for all purposes.

3. A hearing on Defendant's Objections was had on or about May 23, 2014. The Court subsequently ruled that Dr. Davey's report was insufficient and gave Plaintiffs an extension in which to cure the deficiencies in Dr. Davey's report.

4. In an attempt to cure the deficiencies, Plaintiffs filed an amended report from Dr. Davey. See, Dr. Davey's Amended Report attached hereto as Exhibit "A" and incorporated herein for all purposes. However, Dr. Davey's amended report remains insufficient and Defendant hereby files its objections to Dr. Davey's amended report.

## II.
## LAW REGARDING HEALTH CARE LIABILITY CLAIMS

5. As a health care liability claim, Plaintiffs' lawsuit is subject to Chapter 74 of the TEXAS CIVIL PRACTICE & REMEDIES CODE which requires Plaintiffs to serve an expert report. *See*, Chapter 74 TEX. CIV. PRAC. & REM. CODE (Vernon 2011). Specifically, §74.351 of the statute, requires Plaintiffs to serve:

> …a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

6. Defendant may challenge the adequacy of the expert report filed by Plaintiffs. *See*, TEX. CIV. PRAC. & REM. CODE §74.351 (Vernon 2011).

7. If an expert report does not adequately comply with the statutory requirements, the Court *shall* enter an order dismissing Plaintiffs' claims against Defendant with prejudice *and*

awarding reasonable attorney's fees and court costs incurred by Defendant. *See,* TEX. CIV. PRAC. & REM. CODE §75.351(b)(Vernon 2011)(emphasis added).

8. Defendant hereby timely files its Objections to Dr. Davey's amended report.

### III.
### OBJECTIONS

### A.
### REQUIREMENTS OF CHAPTER 74 EXPERT REPORTS

9. In order to pursue a health care liability claim, Plaintiffs must first file a report as to each Defendant and that report must be written by a qualified expert that fulfills the statutory requirements which require a fair summary of the expert's opinion regarding (1) the applicable standard of care; (2) how the Defendant failed to meet that standard of care; *and* (3) how the breach in the standard of care caused the injury or damages claimed. *See,* TEX. CIV. PRAC. & REM. CODE §74.351(r)(6) (Vernon 2011) (emphasis added).

10. In deciding whether the statutory standard has been met, the Court "must" stay within the four corners of the expert report. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex. 2001). Although the report does not need to marshal all of Plaintiffs' proof, it must include the expert's opinion on *each* of the elements. *Id.* A report cannot merely state the expert's conclusions about these elements. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). It is imperative that the expert "explain(s) the basis of his statements to link his conclusions to the fact." *Id.* It is with this in mind that Defendant makes the following objections to Dr. Davey's report:

### A.
### DR. DAVEY'S AMENDED REPORT FAILS TO SUFFICIENTLY EXPLAIN
### HOW DEFENDANT'S ALLEGED BREACH OF THE
### APPLICABLE STANDARD OF NURSING CARE CAUSED DECEDENT'S INJURIES AND/OR DEATH

11. Dr. Davey's amended report fails to adequately link *any* of the alleged breaches in the standard of nursing care to Decedent's death. Instead, Dr. Davey's amended report merely concludes

that Defendant's breaches in the standard of care proximately caused Decedent's pressure ulcers. *See,* Exhibit "A." Specifically, he claims that the breaches in care resulted in pressure to Decedent's sacral region for an extended period of time which caused blood to stop flowing to that area. *Id.* As a result, the tissue died and Decedent developed three severely infected Stage IV pressure ulcers on her sacrum and buttocks "contributing" to her death and causing her pain. *Id.*

12. Chapter 74 requires Plaintiffs to file an expert report fulfilling statutory requirements for a fair summary of the expert's opinion including a description of how the breach in the standard of care caused the injury or damages claimed. *See,* TEX. CIV. PRAC. & REM. CODE §74.351(r)(6) (Vernon 2011). A report cannot merely state the expert's conclusions about this element. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). It is imperative that the expert "explain(s) the basis of his statements to link his conclusions to the fact." *Id.* Thus, in order to meet the statutory requirements, an expert report must reasonably explain how Defendant's conduct probably caused Decedent's death.

13. Dr. Davey's conclusory opinions are insufficient and fail to provide sufficiently specific information to show more than speculation on the element of causation. Specifically, he does not rule out other causes for the wounds, explain how any breach in the standard of care caused the wounds to become infected and/or offer any basis to support his claim that the wounds were painful. More importantly, Plaintiffs have asserted a wrongful death claim and there is nothing in Dr. Davey's amended report adequately linking the wounds to Decedent's death. In fact, in the paragraph describing how the wounds impacted Decedent, Dr. Davey does not mention Decedent's ultimate cause of death. In his conclusion, he states that the wound infections contributed to her death, but does not explain the basis for this conclusion. As such, his opinion is conclusory and fails to comply with the statutory requirements.

## IV.
### MOTION TO DISMISS AND FOR ATTORNEYS' FEES

14. Dr. Davey's amended report does not comply with the statutory requirements of Chapter 74. As such, this lawsuit against Defendant should be dismissed with prejudice and Defendant should be awarded its reasonable attorneys' fees and costs. *See*, TEX. CIV. PRAC. & REM. CODE §74.351.

## V.
### CONCLUSION & PRAYER

15. Plaintiffs' health care liability claim is governed by Chapter 74, which required Plaintiffs to file a report which discussed how Defendant breached the applicable standard of care caused Decedent's injury and/or death. Dr. Davey's amended report fails to explain how these alleged breaches in the standard of nursing care caused Decedent's injuries and/or death. As a result, Defendant's objections to Dr. Davey's amended report should be sustained.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that the Court grant Defendant's Objections to Dr. Davey's amended report. Defendant further prays for all additional relief to which it may be justly entitled.

Respectfully submitted,

LEWIS, BRISBOIS, BISGAARD & SMITH, LLP

Nichol L. Bunn
State Bar No. 00790394
Nichol.Bunn@LewisBrisbois.com
Amber R. Pickett
State Bar No. 24058046
Amber.Pickett@LewisBrisbois.com
901 Main Street, Suite 4100
Dallas, Texas 75202
Telephone: (214) 722-7105
Facsimile: (972) 638-8664

ATTORNEYS FOR DEFENDANT
PINECREST SNF, LLC D/B/A PINECREST NURSING &
REHABILITATION CENTER

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing instrument has been sent to all counsel of record via certified mail, return receipt requested on this the 15ᵗʰ day of July 2014.

Robert M. Wharton
Lauren Schultz
Mary Green
MCIVER BROWN LAW FIRM
JP Morgan Chase Bank Building
712 Main Street, Suite 800
Houston, Texas 77002

Nichol L. Bunn

# Exhibit A

59

I am providing this amended expert report in the Archie Bailey (also referred to herein as "the patient") matter. This report reflects my expert opinion regarding the standard of care and the proximate cause of injuries sustained by Ms. Bailey.

Summary of Findings:

It is my opinion that Pinecrest Nursing & Rehab Center (also referred to herein as "Pinecrest Nursing") breached the standard of care by allowing Ms. Bailey's intact skin to deteriorate, which developed into an infected Stage IV pressure ulcer on her sacrum during the time of her stay (TR-000002 to TR-000005, TR-000712). Ms. Bailey was admitted to Pinecrest Nursing with intact skin. The standard of care requires facilities like Pinecrest Nursing to prevent pressure ulcers from developing and to promote the healing of any pressure ulcers that do develop. Pinecrest Nursing breached the standard of care by allowing Ms. Bailey to develop a pressure ulcer and by allowing the pressure ulcer to progress to a Stage IV. Specifically, Pinecrest Nursing failed to implement adequate interventions to offload sustained pressure on Ms. Bailey's sacrum for extended periods of time. The sustained pressure caused Ms. Bailey's soft tissues to become distorted and die, which caused the Stage IV pressure ulcer. Ms. Bailey suffered harm as a result of the infected pressure ulcer, including surgical debridement, wound VAC placement, and intravenous (IV) antibiotics to treat her infections (TR-000065, TR-000311 to TR-000312, TR-000840 to TR-000842).

Qualifications

I am a licensed physician who has actively been practicing medicine since 1981. After graduating from medical school in 1972, I did internships in cardiology, general surgery, and internal medicine and a residency in anatomical and clinical pathology. Initially I served as an emergency medicine physician at Columbia Edward White Hospital in Saint Petersburg, Florida, where I served as the Emergency Room Director for three years. Since 1987, I have actively and continuously practiced full-time Family Practice/Geriatric Medicine in office, hospital, and nursing home settings. In addition to my general adult and geriatric medicine practice, I have a special interest in skin care and wound care. As such, I have been board certified by the American Academy of Wound Management as a Wound Specialist since 1997. Currently, I practice internal medicine and geriatric medicine at the Edward White Center for Wound Care and Hyperbaric Medicine, where I have served as the Medical Director of Hyperbarics since 2011, and I hold admitting privileges at Edward White Hospital and St. Anthony's Hospital.

From 1988 to 1989, I served as the Medical Director of Heartland Nursing Home. I also served as the Medical Director of Fisher Nursing Home from 1992 to 2000 and as the Medical Director of St. Pete Health Care Center from 1992 to 1995. From 1993 to 1998, I was the Medical Director of Alpine Nursing Home, and from 1996 to 1997, I was the Medical Director of Carrington Place Nursing Home. Beginning in 1996, I served as the Medical Director of Shore Acres Nursing Home for two years. I was the Medical Director of Abbey Nursing Home from 1998 to 2000 and the Medical Director of Northshore ALF from 1998 to 2001. From 2000 to 2007, I served as the Medical Director of Coquina Key Nursing and Rehabilitation Center, and from 2001 to 2005, I

1

served as the Medical Director of Westminster ALF. In addition to my ten medical director positions over the past twenty years, I have also served as a board member of the Florida Medical Director's Association. I also served/serve on the Utilization Review and Quality Assurance Committee at HCA Edward White Hospital and Columbia Edward White Hospital and on the Medical Quality and Education Committee at St. Anthony's Hospital. I have also held admitting privileges at Edward White Hospital and St. Anthony's Hospital in St. Petersburg, Florida since 1987. Since I began practicing medicine in 1981, I have overseen staff members such as nurses and nurse assistants in hospitals and nursing homes. Through these various positions, I have become very familiar with the minimum standard of care required of these healthcare providers.

By virtue of my training, education, and experience in the area of internal medicine and geriatric medicine, I have knowledge regarding the procedures, diagnoses, treatments, and conditions that are involved in this case, of the applicable standard of care, and of the opinion, which I am rendering in this amended expert report. Specifically, based on my training, education, and experience, I have direct knowledge concerning the standard of care applicable to pressure ulcer prevention, treatment orders, and patient care planning such as that care provided to Archie Bailey at Pinecrest Nursing & Rehab Center. In particular, as part of my training, education, and experience, I have provided health care to patients such as Ms. Bailey in the hospital and/or nursing home and worked with and supervised nurses, staff members, and other healthcare providers in connection with such care. Further, based on my training, education, and experience in working with and supervising nurses, nurse assistants, and other medical staff in the area of internal medicine and geriatric medicine, I have knowledge of and am familiar with the applicable standards of care as they pertain to physicians, nurses, nurse assistants, and staff regarding their duties and obligations in performing and carrying out the procedures and treatments under the circumstances at issue in this case, which led to the injuries of Ms. Bailey on 9-17-13, which contributed to her death on 12-4-13.

I have seen patients like Ms. Bailey who received care that met the applicable standards of care set forth in this report who did not develop pressure ulcers. On the other hand, I have also seen patients like Ms. Bailey where the standards of care were not met and pressure ulcers developed or got worse. Based on my training and education, I understand not just what the standard of care requires, but also what is likely to occur if the standard of care is not met. Therefore, I am qualified based on my education, training, and experience to render the opinions in this report.

Materials Reviewed

In preparing this report, I have reviewed the medical records of (1) Pinecrest Nursing & Rehab Center, (2) Trinity Mother Frances Hospital, (3) Tyler Continue Care Hospital, (4) The University of Texas Health Science Center at Tyler, (5) Colonial Tyler Care Center, and (6) the death certificate of Ms. Bailey. I base my opinions on the items I reviewed and my knowledge of the standard of care with which I am familiar because of my education, training, and experience. These records provide a sufficient basis for my

2

61

opinion regarding the applicable standard of care, and that the breaches in the standards of care by Pinecrest Nursing were the proximate cause of injuries to Ms. Bailey.

Factual and Medical Background

Based on my review of the medical records referenced above, the following is a summary of events that led to Ms. Bailey's injuries.

Ms. Bailey, an 86-year-old female, was admitted to Pinecrest Nursing on 6-12-10 for long-term care for Alzheimer's disease (TR-001972). She had a history of hypertension, congestive heart failure, diabetes mellitus, and asthma (TR-001970 to TR-001971). Upon admission to Pinecrest Nursing, Ms. Bailey's skin was warm, dry, and intact (TR-002227, TR-002533). According to the documentation in the medical records, Ms. Bailey was incontinent of bowel and bladder and required total assistance with all of her Activities of Daily Living (TR-002184, TR-002252). A Braden Scale assessment was performed on 1-1-13, and Ms. Bailey was assessed as having a moderate risk for developing pressure ulcers with a score of 13 (TR-001977). She was also noted to have adequate nutrition levels (TR-001977).

On 3-20-13, nurses noted a 0.2 x 0.2 cm excoriated area to Ms. Bailey's left sacrum with granulated tissue and a scant amount of serous drainage present (TR-001983). However, by 4-3-13, this area was described as "improved" by the nursing staff, and no open area was found (TR-001983). According to the documentation in the weekly non-pressure skin condition report, Ms. Bailey had no skin problems from April 2013 until the beginning of August 2013 (TR-001983 to TR-001985). On 8-12-13, the nursing staff at Pinecrest Nursing noted a 0.3 x 0.2 cm excoriated area on Ms. Bailey's gluteal fold (TR-001989). The area of skin breakdown on Ms. Bailey's sacral area had developed a scant amount of serous exudate by 8-19-13, and nurses noted the area had "deodorized" (TR-001989).

Several days later, on 8-22-13, a Stage II pressure ulcer was discovered on Ms. Bailey's sacral area that measured 1.0 x 0.3 cm and had a small amount of serous exudate present (TR-001978). Ms. Bailey began to experience a "continuous" and "aching" pain from her sacral ulcer on 9-3-13, and at this time, her Stage II pressure ulcer had increased in size to 0.8 x 1.0 x 0.2 cm (TR-001979). On 9-12-13, the nursing staff failed to stage the wound, but they noted measurements of 2.0 x 2.0 x 2.0 cm and the presence of serosanguineous drainage (TR-001979). By 9-17-13, Ms. Bailey had an unstageable pressure ulcer on her sacrum that measured 8.0 x 15.0 x >2.0 cm (TR-001980). According to the documentation in the weekly pressure ulcer record, the wound had a moderate amount of serosanguineous exudate and was causing Ms. Bailey a significant amount of pain (TR-001980).

On 9-19-13, Ms. Bailey was discharged from Pinecrest Nursing and transferred to Trinity Mother Frances Hospital for elevated white blood cell count of 20.6 thou/mm³ (TR-000002, TR-001972, TR-002525). Upon admission to the ER at Trinity Mother Frances Hospital, Ms. Bailey was diagnosed with a Stage IV decubitus ulcer on her sacrum.

3

62

leukocytosis, and a urinary tract infection (UTI) (TR-000002, TR-000006). Cultures taken from the wound on her sacrum later revealed the presence of *Proteus mirabilis* (TR-000007, TR-000712). She also had a Stage II pressure ulcer on her left buttock (TR-000026). That same day, Ms. Bailey was transferred to Tyler Continue Care Hospital for further management of her wounds (TR-000006, TR-000061).

Upon admission to Tyler Continue Care Hospital, Ms. Bailey had a Stage IV sacral ulcer that measured 11.0 x 12.0 x 3.0 and had a foul odor (TR-000285, TR-000483). The wound had a small amount of green purulent drainage and was covered in black eschar (TR-000285, TR-000730). Ms. Bailey also had a Stage II pressure ulcer on her left buttock that measured 3.0 x 3.0 x 0.25 cm and a Stage II pressure ulcer on her right buttock that measured 3.0 x 3.0 x 0.1 cm (TR-000285). Both buttock wounds had a small amount of serosanguineous drainage present (TR-000285). According to her dietary consult on 9-20-13, Ms. Bailey was malnourished, and her nutritional status was described as "severely compromised" (TR-000283). Her lab values from 9-19-13 revealed an albumin of 2.4 g/dL, for which a normal range is 3.9-5.0 g/dL, and a pre-albumin of 38 mg/L, for which a normal range is 176-360 mg/L (TR-000011, TR-000283, TR-000701, TR-002329). Ms. Bailey's low pre-albumin level suggested severe visceral protein depletion (TR-000283).

According to the wound care consult on 9-24-13, the pressure ulcer had a "foul malodorous odor," and the surrounding peri-wound area had excoriated non-blanchable redness (TR-000842). On 9-26-13, Ms. Bailey underwent excisional debridement of necrotic tissue from her sacral wound as well as partial excision of portions of bone of the involved coccyx (TR-000311 to TR-000312). The bone sample later revealed reactive changes and some inflammation, indicating possible osteomyelitis (TR-000448). Following debridement, the wound measured 11.5 x 8.0 x 6.0 cm with moderate serosanguineous drainage and 3.0 cm of undermining, and the two buttock wounds had become part of the sacral wound (TR-000842, TR-000701 to TR-000702). A wound VAC was placed on the sacral ulcer to promote healing, and IV antibiotics were administered to treat Ms. Bailey's infections (TR-000085, TR-000167, TR-000842).

On 9-30-13, Ms. Bailey underwent another surgical debridement of her Stage IV pressure ulcer, and following the procedure, the wound measured 11.0 x 7.0 x 7.0 cm (TR-000842). The wound VAC was changed, and the negative pressure treatment was continued (TR-000842). Ms. Bailey's sacral ulcer was debrided two more times before her discharge on 10-22-13 (TR-000840 to TR-000841).

On 10-22-13, Ms. Bailey was admitted to Colonial Tyler Care Center for continued wound care and nutritional therapy (TR-002566 to TR-002569). She continued to receive negative pressure therapy from a wound VAC as well as a therapeutic diet to promote wound healing (TR-002617, TR-003635). As of 11-4-13, Ms. Bailey's sacral pressure ulcer measured 11.0 x 9.0 x 6.0 cm (TR-002644). Unfortunately, her condition failed to improve, and she was placed on hospice care. On 12-4-13, Ms. Bailey expired from cardio-pulmonary arrest, as indicated on her death certificate (TR-002743). However, it is my opinion, to a reasonable degree of medical probability, that Ms.

4

Bailey's large and infected pressure ulcer was a significant, contributing factor to her death.

Following my review of the medical records in this matter, it is my opinion that the staff at Pinecrest Nursing violated the standard of care. For the purpose of this report, I will discuss the standard of care, breach of standard of care, and proximate causation.

### Pinecrest Nursing & Rehab Center

#### Relevant Standards of Care

**First: Prevent Avoidable Pressure Ulcers.** Medicare and Medicaid provide rules that require long term care facilities to provide a base level of care. Failure to meet the level of care provided by the rules found in 42 CFR 483, Subpart B is a violation of the regulations intended to protect residents. It is also an indication of a violation of the standard of care by the staff of the facility and the administration of the facility. Section 483.25(c)(1) provides that a facility and its nurses ensure that a resident who is admitted without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that the sores were unavoidable and that a resident who develops pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing. The purpose of this is to prevent residents from getting pressure ulcers and to promote behavior that allows for the healing of decubitus ulcers. There are a number of interventions that exist to prevent pressure sores that are identified and explained in more detail below. For example, the standard of care requires that a patient be turned, provided with pressure-relieving devices, be kept clean and dry, and be kept properly nourished. The standard of care also requires that a patient receive frequent head-to-toe body examinations to look for early signs of this problem.

One additional source regarding the standard of care is the National Pressure Ulcer Advisory Panel. The NPUAP is a collection of experts tasked with creating treatment algorithms that show the proper method for preventing pressure ulcers. In 2009, the NPUAP published a 26-page reference guide on how to prevent pressure ulcers. This reference guide, which is available under the educational and clinical resources tab of the NPUAP website (www.npuap.org), provides a detailed description of what the standard of care requires.

The NPUAP identifies eight things that health care providers should address when caring for a patient at risk of developing pressure ulcers:

1. Pressure ulcer risk assessment: The standard of care requires health care providers to conduct a structured risk assessment on admission and as frequently and as regularly required based on patient acuity. In addition, health care providers should reassess the patient's risk level if the patient has a change in condition. The purpose of the assessments is to gauge the patient's risk of developing a pressure ulcer and to ensure a proper plan of

9

64

care is implemented to prevent a pressure ulcer from developing.

2. Skin assessment: Likewise, the standard of care requires health care providers to perform assessments to determine the integrity of the patient's skin and to determine whether a change in the care plan is necessary. Skin assessments should be performed regularly, although the frequency of inspection may need to be increased if there is any deterioration in the patient's overall condition.

3. Skin care: The standard of care requires provider to care for the skin in a manner that prevents breakdown. This includes, for example, not turning a patient onto a body part that is still reddened from a previous episode of pressure loading.

4. Nutrition: Because a decline in nutritional status can lead to skin breakdown, the standard of care requires provider to ensure patients are receiving adequate nutrition. This includes offering high-protein supplements and/or tube feeding, in addition to the usual diet, to patients with nutritional risk. It is important that health care providers communicate with the dietary team to ensure the patient does not become malnourished.

5. Repositioning: The standard of care also requires providers to frequently and regularly reposition patients to prevent sustained pressure being applied to the same part of the body for an extended period of time.

6. Mattress and bed use: Because special devices can also offload pressure to parts of the body, the standard of care requires providers to install special devices, such as low air mattresses, for high-risk residents.

7. Support surfaces while seated: For high-risk patients, the standard of care requires health care providers to consider and use support surfaces, such as wheelchair cushions, to offload pressure to parts of the body while the patient is seated.

8. Other support surfaces: The standard of care also requires providers to avoid devices that would promote skin breakdown, such as cutout, ring or donut-type devices.

Failing to do any of the above is a breach of the standard of care.

Second: Properly treat pressure ulcers. The standard of care also requires that a resident who has pressure sores must receive the necessary treatment and services to promote healing and prevent infection. This standard of care is supported by Title 42, Code of Federal Regulations, Section 483.25(c)(2). The purpose of this requirement is to promote behavior that allows for the healing of decubitus ulcers. There are a number of

6

65

Page 178

Interventions that exist to promote healing and prevent further skin breakdown. For example, the standard of care requires that a patient be positioned so that pressure on the ulcer is relieved, the patient is kept clean and dry, and the patient is provided with adequate nutrition to support healing. The pressure ulcer and surrounding skin should also be cleansed at the time of each dressing change. Appropriate dressing and treatments should be used, or the ulcer is unlikely to heal, as was the case here. The standard of care also requires that a facility and its nurses intervene such that a patient who has ulcers heals. The standard of care also requires that regular and complete assessments be performed and documented so that the necessary interventions can be implemented. Failing to do any of the above is a breach of the standard of care.

Third: Implement 40 Texas Admin. Code, Rule 19.901. Another source of requirements that nursing homes must meet is Title 40, Chapter 19 of the Texas Administrative Code. The Texas Administrative Code, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001 states (a) the facility must have sufficient staff to provide 24-hour nursing and related services to attain or sustain the highest practicable physical, mental and psychosocial well-being of each resident, as determined by resident assessments and individualized plans of care. When treating a patient with a high risk of developing pressure ulcers, a facility and its agents must properly and regularly assess the patient, including daily and complete skin assessments, proper documentation of the patient's daily activities, and monitoring the patient's body weight. Such accurate and complete documentation is necessary to properly assess and implement optimal nursing interventions. In addition, staffing levels should reflect the complexity of the care required, the size of the facility, and the type of services delivered. This means that the training, selection, and supervision of the staff must be sufficient to handle the nursing care that is needed by the residents who are accepted into the facility.

The history behind the nursing home regulations informs about its purpose. In the past, most nurses in nursing homes had little or no formal training in gerontology and long-term care (IOM, 1986). Many nursing home attendants or aides had no formal training. In 1986, only 17 states had mandated training requirements for nursing attendants, and there were no federal standards for training (IOM, 1986). In a 1986 study, conducted at the request of Congress, the Institute of Medicine found that residents of nursing homes were being abused, neglected, and given inadequate care. The Institute of Medicine proposed sweeping reforms, most of which became law in 1987 with the passage of the Nursing Home Reform Act, part of the Omnibus Budget Reconciliation Act of 1987. The basic objective of the Nursing Home Reform Act was to ensure that residents of nursing homes received quality care that resulted in their achieving or maintaining their "highest practicable" physical, mental, and psychosocial well-being.

Fourth: Implement The Nursing Home Reform Act of 1987. To ensure quality care in nursing homes, the Nursing Home Reform Act requires the provision of certain services to each resident and establishes a Residents' Bill of Rights. Nursing homes receive Medicaid and Medicare payments for long-term care of residents only if they are certified by the state to be in substantial compliance with the requirements of the Nursing Home

7

Reform Act. The purpose of these reforms was to ensure that facilities had sufficient staff that was sufficiently trained and supervised to provide quality care to the residents. Such training and supervision are especially important when it comes to care of dependent residents. Failing to have a staff that is sufficiently trained and supervised, which includes the facilities policies as well as the implementation of those policies, to attain and maintain the highest practicable physical, mental and psychosocial well-being of the residents is a violation of the standard of care applicable to nursing homes.

### Breaches of Standards of Care

Over the course of the care of Ms. Bailey, it is clear that Pinecrest Nursing violated the standard of care in the following respect:

First: Failing to prevent a pressure sore;
Second: Failing to properly treat the patient's pressure ulcers once they developed;
Third: Failing to implement The Texas Administrative Code, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001; and
Fourth: Failing to implement The Nursing Home Reform Act of 1987.

First: Pinecrest Nursing violated the standard of care by failing to prevent a pressure ulcer from occurring, which was a proximate cause of harm to Ms. Bailey. This standard of care mandates that a facility and its nurses ensure that a resident who is admitted without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable and that a resident who has pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing. Ms. Bailey was admitted to Pinecrest Nursing without any pressure ulcers (TR-002227, TR-002533). The Braden Skin Score is used to assess a resident's risk for developing pressure ulcers. According to Pinecrest Nursing, Ms. Bailey was not a high risk of developing pressure ulcers with a Braden Score of 13 (TR-001977). On 7-1-13, the nursing staff assessed Ms. Bailey as only being a moderate risk for the development of pressure ulcers (TR-001977). In my professional opinion, this is not an accurate assessment of Ms. Bailey's risk level. At the time of this assessment, Ms. Bailey required extensive assistance for all her Activities of Daily Living, including bed mobility, and she had a history of generalized weakness and debility, which would have severely limited her from freely repositioning herself (TR-002018 to TR-002019, TR-002184, TR-002252 to TR-002253). Despite these factors, she was assessed as "chairfast" when she should have been assessed as "bedfast" (TR-001977). Furthermore, given Ms. Bailey's age, her skin would have been thin, dry, and susceptible to friction and shear; yet, the Braden Skin assessment described her as having only a "potential problem" for friction and shear (TR-001977, TR-002232 to TR-002253). She was also incontinent of bowel and bladder, which would have significantly increased her risk for skin breakdown (TR-002254). With such inaccurate assessment, the nursing staff at Pinecrest Nursing would not have initiated the appropriate interventions required for Ms. Bailey's actual risk level. Because Ms. Bailey actually had a high risk of developing pressure ulcers, Pinecrest Nursing had the duty to institute interventions to prevent skin breakdown, such as those recommended by the NPUAP.

8

There is no evidence within the medical records that adequate preventive measures, such as those recommended by the NPUAP, were implemented to prevent Ms. Bailey's sacral ulcer from developing. Despite Ms. Bailey's high risk for skin breakdown, nothing in the medical records suggests that the nurses were frequently turning and repositioning her, even after skin breakdown was discovered on her sacrum (TR-001978 to TR-001989, TR-002030 to TR-002076). By 6-1-13, Ms. Bailey was completely dependent on the nursing staff for all of her Activities of Daily Living, and she required excessive assistance to change positions while in bed (TR-002232). With a resident like Ms. Bailey, nurses should be repositioning the resident at least once every two hours. However, the medical records fail to present any evidence that Ms. Bailey's turning/repositioning schedule was ever documented, which suggests she was not repositioned every two hours as required by the standard of care (TR-002030 to TR-002076). Over the course of Ms. Bailey's entire stay at Pinecrest Nursing, there are no entries in the nursing notes indicating the resident was ever repositioned (TR-002030 to TR-002045). Similarly, there is no evidence within the medical records that any special devices were used to offload pressure from Ms. Bailey's sacral area until after she developed a pressure ulcer (TR-001978, TR-002030 to TR-002076). Although Ms. Bailey developed skin breakdown on 8-12-13, a low air mattress was not mentioned until 8-22-13, when the nursing plan of care was updated (TR-001989, TR-002698). Even though a low air loss mattress was mentioned in this revised plan of care, the medical records do not reflect that the nurses ever initiated and followed through with this intervention (TR-002030 to TR-002076).

Furthermore, there is no evidence in the medical records that Ms. Bailey's skin was regularly, appropriately, and timely assessed and that such assessments were accurately and completely documented to implement optimal and necessary interventions to prevent the occurrence of a pressure ulcer (TR-001951 to TR-001969, TR-002030 to TR-002076). Not only did the nurses at Pinecrest Nursing inaccurately assess Ms. Bailey's risk of pressure ulcer development, they failed to implement an appropriate plan of care to prevent skin breakdown (TR-001977, TR-002074 to TR-002076). Care plan meetings were held on 1-17-13 and 4-11-13, but Ms. Bailey's risk of skin breakdown was never discussed (TR-002094, TR-002097). Although "preventative care" was mentioned in the 4-10-13 nursing plan of care regarding Ms. Bailey's skin integrity, the nursing staff failed to list any specific interventions (TR-002095). On 8-12-13, a "macerated area" was discovered on Ms. Bailey's gluteal fold (TR-001989). Despite this change in condition, the nursing plan of care was not updated, and specific interventions were not listed, until 8-22-13 (TR-002698). By this time, Ms. Bailey had already developed a Stage II pressure ulcer (TR-001978). While this change in condition was documented in the non-pressure ulcer report, it was never mentioned in any of the entries in the nursing notes (TR-001989, TR-002030 to TR-002076). Not only is accurate and complete documentation necessary to properly assist and properly implement optimal nursing interventions, it is crucial to monitor skin breakdown and track a wound's progress. The medical records here demonstrate both inaccurate and inconsistent documentation. If Pinecrest Nursing and its nursing staff had properly assessed and documented Ms. Bailey's skin breakdown, and properly updated the plan of care, the appropriate

9

interventions could have been implemented before the skin breakdown on Ms. Bailey's sacrum became a severe pressure ulcer (TR-001978 to TR-001980, TR-001989). Because the nurses and staff did not ensure that Ms. Bailey, who entered the facility with intact skin, did not develop a pressure ulcer, the facility and the nurses breached the standard of care.

Second, Pinecrest Nursing violated the standard of care by failing to promote the healing of Ms. Bailey's sacral pressure ulcer. If a resident has already developed pressure ulcers, appropriate nursing interventions can be implemented to promote the healing of these ulcers. While progress is slow, continued care and treatment can prevent complications such as further tissue damage, infection, and pain. After reviewing the medical records, it is clear that the assessments, treatments, and interventions described above were not performed here. First, once the skin breakdown was discovered on Ms. Bailey's sacrum on 9-12-13, the nursing staff at Pinecrest Nursing should have been frequently monitoring the area of skin breakdown, documenting any changes in condition, and describing the progression of the wound. Instead, the nurses waited a week to reassess Ms. Bailey's area of skin breakdown, and by that time, it had deteriorated into a Stage II pressure ulcer (TR-001978, TR-001989). On 9-12-13, the nurses assessed the pressure ulcer as measuring 2.0 x 2.0 x 2.0 cm, but they failed to stage it (TR-001979). Five days later, Ms. Bailey's sacral ulcer had become unstageable (TR-001980). When an ulcer is classified as unstageable, it means that the ulcer is at least Stage III or Stage IV, but the ulcer is heavily covered in necrotic tissue, preventing health care providers from seeing how deep the injury extends under the skin. On 9-17-13, Ms. Bailey's unstageable pressure ulcer measured 8.0 x 15.0 x >2.0 cm with a moderate amount of serosanguineous drainage, according to the documentation in the weekly pressure ulcer record (TR-001980). That same day, the wound was assessed for the first time in the nursing notes, and the entry described the wound as "deteriorated" with measurements of 18.0 x 10.0 cm (TR-002053). According to the nursing notes, the wound had 100% necrotic tissue, and its depth was unable to be measured (TR-002053). The medical records here demonstrate both inaccurate and inconsistent documentation. Proper assessment is necessary for proper treatment of pressure ulcers. Measurement and accurate description of wounds is crucial to track a wound's progress and response to treatment. By the time Ms. Bailey transferred to the ER at Trinity Mother Frances Hospital, she had an infected Stage IV pressure ulcer (TR-000002 to TR-000005). If Pinecrest Nursing and its nurses had properly assessed and documented Ms. Bailey's pressure ulcer, the appropriate interventions could have been implemented before the wound progressed to a Stage IV pressure ulcer (TR-TR-000002 to TR-000005).

Not only is accurate and complete documentation necessary to properly assess and properly implement optimal nursing interventions, it also enables other members of the facility, such as physicians and dieticians, to treat the patient's conditions promptly and correctly. The nursing staff at Pinecrest Nursing failed to regularly assess Ms. Bailey's pressure ulcer as indicated by the lack of skin and wound care assessments in the nursing notes (TR-002030 to TR-002076). Because the nurses failed to accurately and consistently document the status of Ms. Bailey's pressure ulcer and provide adequate and detailed descriptions, the attending physician was not notified of Ms. Bailey's worsening

10

69

pressure ulcer for over two weeks (TR-002046). As a result, a wound care consultation and wound care treatment were not ordered for Ms. Bailey until after her sacral ulcer had developed a depth of 0.2 cm, which was indicative of a Stage III pressure ulcer (TR-001979, TR-000001 to TR-002000, TR-000042, TR-002531). Aside from these orders, Ms. Bailey's pressure ulcer was never mentioned in any of the physician's progress notes or consultations (TR-001990 to TR-001992). The nurses caring for Ms. Bailey should have brought the wound and the fact that it was becoming necrotic to the attending physician's attention, both by accurately documenting their assessment of the wound in the records and by verbally reporting it to one of the physicians. Nurses are required to relay a patient's changes in condition to the attending physician, such as further skin breakdown, such that a physician could evaluate the necessity of interventions such as a low air mattress or a wound consult. If the nurses at Pinecrest Nursing had notified the attending physician of Ms. Bailey's change in condition sooner, the proper interventions could have been implemented before Ms. Bailey's pressure ulcer became unstageable (TR-001960).

Finally, the nursing staff at Pinecrest Nursing should have paid closer attention to Ms. Bailey's nutritional status. In order to promote skin integrity, it is vital that a resident receives adequate nutrition and hydration. As mentioned in the medical summary, Ms. Bailey was admitted to Pinecrest Nursing with adequate nutrition levels (TR-001977). Despite Ms. Bailey's development of a pressure ulcer, the nursing staff at Pinecrest Nursing failed to monitor the resident's laboratory values (TR-002519 to TR-002529). As a result, the nurses were unable to assess Ms. Bailey's nutritional status, and were therefore unaware of her worsening albumin and pre-albumin levels throughout her stay at Pinecrest Nursing. While a multivitamin was administered, additional interventions such as providing snacks between meals, fortifying meals, and/or providing smaller, more frequent meals were never initiated (TR-002000). Pressure ulcer development or the presence of a chronic non-healing pressure ulcer places increased metabolic demands on a patient. Without intervention and aggressive nutritional intervention to provide the raw materials to meet this increased demand for energy, initiate wound closure, and replace potential losses during the wound healing process, healing will be delayed. Ms. Bailey's lab values were not taken until 9-19-11, the day of her discharge (TR-002529). By this time, she had an albumin level of 2.4 g/dL, indicating malnutrition (TR-002529). Upon admission to the ER at Trinity Mother Frances Hospital, she was diagnosed with protein calorie malnutrition and had a pre-albumin level of 5% mg/L (TR-000011, TR-000057). The failure of the nurses to institute appropriate interventions required to stabilize Ms. Bailey's skin integrity, maintain her nutritional status, and prevent complications was clearly a breach in the standard of care.

Third: Pinecrest Nursing violated the standard of care by failing implement The Texas Administrative Code, Title 40, Chapter 19, Nursing Facility Requirements For Licensure and Medicaid Certification, Rule § 19.1001 by not providing sufficient staff to provide 24-hour nursing care and related services reflecting the complexity of the care required, the size of the facility, and the type of services necessary to attain or maintain the highest practicable physical, mental and psychosocial well-being of Ms. Bailey, as determined by the resident assessments and individualized plans of care. When a resident does not

11

70

receive frequent and regular assessments and care, it is indicative of an insufficient staff level. If staffing levels had been appropriate, there would have been nurses and/or staff available to attend to Ms. Bailey. The failure of the facility to provide sufficient staff and to provide 24-hour nursing care and related services is a breach in the standard of care.

Fourth: Pinecrest Nursing violated the standard of care applicable to nursing homes by failing to properly train and supervise its staff and by failing to have policies in place that are designed to maintain the highest practicable physical, mental, and psychosocial well-being of Ms. Bailey. Had the care to Ms. Bailey been provided by sufficiently trained staff and based on well-conceived policies and procedures, appropriate and timely care plans would have been implemented and interventions would have been put in place which would have prevented Ms. Bailey from developing a Stage IV pressure ulcer (TR-000002 to TR-000003). As a result, Pinecrest Nursing breached this standard of care.

## Causation

The following is an explanation of how, to a reasonable degree of medical probability, the breaches of the standard of care identified above proximately caused Ms. Bailey's injuries, including the development of a Stage IV pressure ulcer.

To understand how a pressure ulcer is caused by the negligence of a nursing staff and a facility, it is first important to understand what a pressure ulcer is and what happens to the body to allow them to develop.

### What is a pressure ulcer?

Pressure ulcers, also known as decubitus ulcers or bedsores, are localized injuries to the skin and/or underlying tissue usually over a bony prominence, as a result of pressure, or pressure in combination with shear and/or friction. Most commonly they are found on the sacrum, coccyx, heels or the hips, but other sites such as the elbows, knees, ankles, or the back of the cranium can be affected. They range in severity from mild (minor skin reddening) to severe (deep craters down to muscle and bone).

### What causes a pressure ulcer to develop?

Pressure ulcers occur when soft tissues are distorted in a fixed manner over a period of time. This distortion usually occurs when the soft tissues are compressed and/or sheared between the skeleton and a supportive device (such as a bed or chair). This causes the blood vessels within the distorted tissue to become compressed, angulated, or stretched out of their usual shape. As a result, blood is unable to pass through the vessels. When blood is unable to pass through the vessels, the distorted tissue becomes ischemic. Ischemia is the shortage of oxygen and nutrients needed to keep tissue alive. If ischemia occurs for an extended length of time, then death of the tissue occurs, a process known as necrosis.

12

Other factors cause pressure ulcers, too. If a person slides down in the bed or chair, blood vessels can stretch or bend and cause pressure ulcers. Even slight rubbing or friction on the skin may cause minor pressure ulcers.

*How does the failure to comply with the standard of care cause serious pressure ulcers?*

The standards of care discussed above related to preventing pressure ulcers all focus on identifying those at risk for the development of pressure ulcers and providing the interventions necessary to prevent the development of the ulcers. When a facility or its nurses fail to have, enforce, or enact the appropriate measures to assess a person's risk for developing a pressure ulcer, then the person does not receive the necessary care to prevent the development of ulcers. When a facility or its nurses fail to have, enforce, or enact the appropriate interventions to prevent the development of ulcers, then the patient or resident is more likely than not going to develop ulcers.

Once an ulcer develops, the standard of care shifts from prevention to treatment, as detailed above. According to the recommendations of the National Pressure Ulcer Advisory Panel (NPUAP) Consensus Development, the following describes the staging of pressure ulcers:

Stage 1
Nonblanchable erythema of intact skin, the heralding lesion of skin ulceration. In individuals with darker skin, discoloration of the skin, warmth, edema, induration, or hardness may also be indicators. A Stage I pressure ulcer is an observable pressure related alteration of intact skin whose indicators as compared to the adjacent or opposite area on the body may include changes in one or more of the following: skin temperature (warmth or coolness), tissue consistency (firm or boggy feel) and/or sensation (pain, itching). The ulcer appears as a defined area of persistent redness in lightly pigmented skin, whereas in darker skin tones, the ulcer may appear with persistent red, blue, or purple hues.

Stage 2
Partial thickness skin loss involving epidermis, dermis, or both. The ulcer is superficial and presents clinically as an abrasion, blister, or shallow crater.

Stage 3
Full thickness skin loss involving damage to or necrosis of subcutaneous tissue that may extend down to, but not through, underlying fascia. The ulcer presents clinically as a deep crater with or without undermining of adjacent tissue.

Stage 4
Full thickness skin loss with extensive destruction, tissue necrosis, or damage to muscle, bone, or supporting structures (e.g., tendon, joint capsule). Undermining and sinus tracts also may be associated with Stage

13

72

Page 185

4 pressure ulcers.

### Unstageable/Unclassified

Full thickness tissue loss in which the base of the ulcer is completely covered by slough (yellow, tan, gray, green or brown) and/or eschar (tan/brown or black) in the wound bed. Until enough slough and/or eschar is removed to expose the base of the wound, the true depth and stage cannot be determined. However, it will be either a Stage III or Stage IV.

### Suspected Deep Tissue Injury

Purple or maroon localized area of discolored intact skin or blood-filled blister due to damage of underlying soft tissue from pressure and/or shear. The area may be preceded by tissue that is painful, firm, mushy, boggy, warmer or cooler as compared to adjacent tissue. Deep tissue injury may be difficult to detect in individuals with dark skin tones. Evolution may include a thin blister over a dark wound bed. The wound may further evolve and become covered by thin eschar. Evolution may be rapid exposing additional layers of tissue even with optimal treatment.

The standards of care related to treatment are intended to prevent ulcers from progressing from a Stage I or Stage II wound to a Stage III or Stage IV wound. When insufficient care is provided to treat ulcers and the ulcer progresses to a Stage III or a Stage IV wound, then the patient or resident suffers a number of complications directly caused by the failure to assess, prevent, and treat ulcers.

*How do severe pressure ulcers impact residents and patients?*

First, and most obviously, Stage III and Stage IV pressure ulcers impact the skin. These ulcers cause skin loss with extensive destruction, tissue necrosis, and damage to muscle, bone, tendons, and other supporting structures. Second, patients and residents who have severe ulcers have an increased morbidity and mortality rate. Third, patients and residents who have severe ulcers become susceptible to infection and other medical complications related to the wound and its treatment. Fourth, the patients and residents who develop severe ulcers have problems with pain and loss of dignity associated with the wound and its treatment.

*How did the breaches of the standard of care in this case cause Ms. Bailey to develop a severe pressure ulcer?*

In my opinion, to a reasonable degree of medical probability, the breaches of the standard of care discussed above related to the assessment, prevention, and treatment of severe pressure ulcers were the proximate cause of Ms. Bailey's severe pressure ulcer. As stated above, Pleasant Nursing and its nursing staff failed to reposition Ms. Bailey every two hours, keep her skin clean and dry, and implement other appropriate interventions to relieve pressure and promote skin integrity. Pleasant Nursing and its nursing staff also failed to properly treat the pressure ulcer and encourage its healing once it developed.

14

Because Pinecrest Nursing failed to reposition her every two hours and failed to implement effective interventions, Ms. Bailey had sustained pressure on her sacral area, which caused the blood to stop flowing to that part of the body and the skin to distort. Because of the lack of blood flow, the tissue died, causing Ms. Bailey to develop an infected Stage IV pressure ulcer (TR-000002 to TR-000005, TR-000280).

*How did the severe pressure ulcer in this case impact Ms. Bailey?*

In my opinion, Ms. Bailey's severely infected Stage IV pressure ulcer was a proximate cause of harm and a major contributing factor to her death on 12-4-13. Pressure ulcers have a profound impact on lives: (1) physically, (2) socially, (3) emotionally, and (4) mentally. Pressure ulcers are associated with pain, fluid leakage, smell, discomfort, difficulties with mobility, and a decrease in appetite. Due to the severity of her pressure ulcer, Ms. Bailey was required to endure multiple surgical debridements of her sacral ulcer as well as placement of a wound VAC (TR-000055, TR-000311 to TR-000312, TR-000870). Because Ms. Bailey's sacral pressure ulcer became infected with *Proteus mirabilis* and she developed osteomyelitis, she required aggressive IV antibiotic therapy for treatment of her infections (TR-000311 to TR-000312, TR-000448, TR-000712). Based on the medical records, I am also able to opine that Ms. Bailey's pressure ulcer caused her significant pain (TR-001979 to TR-001980, TR-002636).

## Conclusion

Accordingly, it is my expert opinion that the breaches of the standard of care by Pinecrest Nursing were proximate causes of severe injury and harm to Ms. Bailey. Absent the breaches in the standard of care, to a reasonable degree of medical probability, the patient would not have suffered from a severe Stage IV pressure ulcer, *Proteus mirabilis* wound infection, osteomyelitis, and malnutrition, all of which contributed to her death on 12-4-13 (TR-000055 to TR-000057, TR-000311 to TR-000312, TR-000712). I hold all of the opinions expressed in this report to a reasonable degree of medical certainty.

Christopher Davey, MD

13

# Curriculum Vitae



**Christopher M. Davey, M.D., P.A.**
2191 9th Ave. North, Suite 115
Saint Petersburg, FL 33713
(727) 321-1234 office  (727) 827-2966 fax
(727) 641-4601 cell
cdavey1@tampabay.rr.com

Dr. Davey trained as a pathologist at Mount Sinai Medical Center in Miami, Florida but since 1987 has practiced in Family Practice and Geriatric Medicine in office, hospital, and nursing home settings. He has held hospital privileges in Family Practice since 1987 at Edward White Hospital and St. Anthony's Hospital in St. Petersburg, Florida. He is advanced cardiac life support certified. He has a special interest in wound diagnosis, prevention and treatment. He is Board certified by the American Academy of Wound Management as a Certified Wound Specialist (CWS) and is a trained Hyperbaric specialist. (Hyperbaric medicine is the treatment of severe wounds and other conditions using high pressure oxygen chambers). He is the Medical Director of Hyperbaric Medicine as well as an active physician at the Edward White Center for Wound Care and Hyperbaric medicine.

Dr. Davey has testified extensively for both plaintiff and defense in cases involving geriatric issues, falls, wounds ("wounds" includes bedsores and pressure ulcers amongst others), complex medical cases and standards of care. His pathology background gives him the expertise to render opinions on cause of death issues.

## Personal
Date of Birth:                    December 19, 1946
Place of Birth:                   London, England
Fla. Medical License Number.      ME-03-4037
DEA Number:                       AD#602371
Languages Spoken:                 English, French, and German

## Education

Medical School:

1968-1972                         St. Mary's Hospital, London University,
                                  England
                                  (Now: Imperial College, London)

Page 1 of 6

**Internship:**

1972-1973
Northwick Hospital and Research Center
Harrow, Middlesex, England
-Cardiology
-General Surgery

1973-1977
Princess Margaret Hospital, Nassau,
Bahamas (on a British Government Aid
Program)
-Internal Medicine with special interest in
Marine Medicine

**U.S. Residency:**

1977-1980
Mt. Sinai Hospital
Miami, Florida
-Pathology: Anatomical and Clinical

## Professional Experience:

1981-1987
Columbia Edward White Hospital
2323 9ᵗʰ Avenue
Saint Petersburg, Florida 33713
-Emergency Medicine: including
three years as Emergency Room Director

1987-Present
Private Practice
2191 9ᵗʰ Ave. North Ste 115
Saint Petersburg, Florida 33713

-Adult and Geriatric Medicine
-Special Interest in Skin Care and Wound
Care including on staff at the Center for
Wound Care and Hyperbaric Medicine at
Edward White Hospital.

Page 2 of 6

<u>Hospital Affiliation:</u>
<u>(Active Medical Staff)</u>
<u>(Dept of Family Practice):</u>

                    Columbia Edward White Hospital
                    2323 9th Avenue
                    Saint Petersburg, Fl 33713

                    St. Anthony's Hospital
                    1200 7th Avenue
                    Saint Petersburg, Fl 33705

<u>Board Certification:</u>

                    Board certified by the American Academy of
                    Wound Management as a Certified Wound Specialist
                    (CWS).

<u>Memberships and Positions Held:</u>

| | |
|---|---|
| 1989-1994: | Member of the Board of Trustees, Columbia Edward White Hospital |
| Previous: | Board Member of the Florida Medical Directors Association |
| Previous: | Medical Director of Sunrise Northshore, Assisted Living Facility and Nursing Home |
| Previous: | Utilization Review and Quality Assurance Committee member at St. Anthony's Hospital |
| Previous: | Member of Florida Medical Directors Association |
| Previous: | Certified Medical Director (AMDA) |

Page 3 of 6

Present:                              Medical Director for Hyperbaric Medicine
                                      Center for Wound Care
                                      HCA Edward White Hospital

Present:                              Utilization Review and Quality
                                      Assurance Committee member at Columbia
                                      Edward White Hospital

Present:                              Member of American Geriatrics Society and
                                      Florida Geriatrics Society

Present:                              Member of Association for
                                      Advancement of Wound Care (national
                                      organization)

Present:                              Member of the Society of University
                                      Founders of the University of Miami,
                                      Coral Gables, Florida

Present:                              Member of the Medical/Surgical Care
                                      Evaluation Committee at
                                      Edward White Hospital

Present:                              Member of the Infectious Control
                                      Committee at Edward White Hospital

Present:                              Member of the Medical Quality and
                                      Education Committee at St. Anthony's
                                      Hospital

Present:                              Member of the Florida Medical Association

## Publications:

Former Editor and Contributor of
"Journal of the Florida Medical Directors
Association" (circulation of about 1,000)

Former Co-Editor of "Journal of Florida Geriatrics
Society"

JUN-28-2014 11:05PM From:wynne... ...werbrown.c     ID:LES... LLP          Page:88...     R=18...

Page 28

78

From Aaron Sharon    From (877) 554-5551    To +16788888888    Fax +16788888888    Page 5 of 6 06/06/2014 12:57

Page 6 of 6

JUN-06-2014 11:00PM From:aaron@Enterbrown.c    DILES LLP    Page 16/21    R=100%

Page 27

# TAB C

Cause Number: 14-0856-B

| | | |
|---|---|---|
| TASCO BAILEY, NATHAN BAILEY, | § | IN THE DISTRICT COURT |
| CURLIE BAILEY, ROY BAILEY, | § | |
| BILL BAILEY, JAMES BAILEY EARL | § | |
| BAILEY, MARY DUNLAP AND | § | |
| LUCILLE MARTIN, AS HEIRS OF | § | |
| ARCHIE BAILEY | § | |
| Plaintiffs | § | |
| | § | |
| | § | |
| VS | § | |
| | § | |
| | § | 114th JUDICIAL DISTRICT |
| PINECREST SNF LLC, d/b/a | § | |
| PINECREST NURSING & | § | |
| REHABILITATION CENTER, | § | |
| Defendant | § | SMITH COUNTY, TEXAS |

FILED
NOV 25 2014
CLERK, 114th JUDICIAL DISTRICT COURT SMITH CO., TX
BY _____ DEPUTY

### ORDER ON DEFENDANT PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER'S OBJECTIONS TO THE AMENDED CHAPTER 74 REPORT OF CHRISTOPHER M. DAVEY, M.D.

On this day came on to be heard Defendant Pinecrest SNF, LLC D/B/A Pinecrest Nursing & Rehabilitation Center's Objections to the Amended Chapter 74 Report of Christopher M. Davey, M.D. for failure to comply with Tex. Civ. Prac. & Rem. Code §74.351. After considering Defendant's objections, Plaintiff's First Amended Motion to Overrule the Objections, the argument of counsel, and the applicable law, the court finds that the objections are not meritorious and should be overruled.

IT IS THEREFORE ORDERED that Defendant Pinecrest SNF, LLC D/B/A Pinecrest Nursing & Rehabilitation Center's Objections to the Chapter 74 Report of Christopher M. Davey, M.D. are OVERRULED.

Signed _____, 2014.

_____
HONORABLE CHRISTI KENNEDY
114TH JUDICIAL DISTRICT COURT
SMITH COUNTY, TEXAS

# TAB D

*Texas Statutes and Codes* > *CIVIL PRACTICE AND REMEDIES CODE* > *TITLE 4. LIABILITY IN TORT* > *CHAPTER 74. MEDICAL LIABILITY* > *SUBCHAPTER H. PROCEDURAL PROVISIONS*

# § 74.351. Expert Report

**(a)** In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

**(b)** If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

**(1)** awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

**(2)** dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

**(c)** If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

**(d)** to (h) [Reserved].

**(i)** Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

**(j)** Nothing in this section shall be construed to require the serving of an expert report regarding any issue other than an issue relating to liability or causation.

**(k)** Subject to Subsection (t), an expert report served under this section:

**(1)** is not admissible in evidence by any party;

**(2)** shall not be used in a deposition, trial, or other proceeding; and

**(3)** shall not be referred to by any party during the course of the action for any purpose.

**(l)** A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).

**(m)** to (q) [Reserved].

stephanie erhart

**(r)** In this section:

**(1)** "Affected parties" means the claimant and the physician or health care provider who are directly affected by an act or agreement required or permitted by this section and does not include other parties to an action who are not directly affected by that particular act or agreement.

**(2)** "Claim" means a health care liability claim.

**(3)** [Reserved].

**(4)** "Defendant" means a physician or health care provider against whom a health care liability claim is asserted. The term includes a third-party defendant, cross-defendant, or counterdefendant.

**(5)** "Expert" means:

**(A)** with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

**(B)** with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

**(C)** with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence;

**(D)** with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a dentist, a dentist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence; or

**(E)** with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a podiatrist, a podiatrist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

**(6)** "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

**(s)** Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for the acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:

**(1)** written discovery as defined in *Rule 192.7, Texas Rules of Civil Procedure*;

**(2)** depositions on written questions under *Rule 200, Texas Rules of Civil Procedure*; and

**(3)** discovery from nonparties under *Rule 205, Texas Rules of Civil Procedure.*

**(t)** If an expert report is used by the claimant in the course of the action for any purpose other than to meet the service requirement of Subsection (a), the restrictions imposed by Subsection (k) on use of the expert report by any party are waived.

**(u)** Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a).

stephanie erhart